ARTHUR D. LITTLE INTERNATIONAL, INC., Plaintiff,

v.

DOOYANG CORPORATION, Dooyang America, Inc., Defendants.

Civil Action No. 94–11875–PBS.

United States District Court, D. Massachusetts.

May 16, 1996.

Peter J. MacDonald, Charles P. Kindregan, Hale & Dorr, Boston, MA, for Arthur D. Little International, Inc.

John A. Donovan, Jr., Burns & Levinson, Boston, MA, Robert L. Weigel, Leslie E. Moore, Leonard Hersh, Lara M. Krieger, Gibson, Dunn & Crutcher, New York City, for Dooyang Corporation.

Peter J. MacDonald, Charles P. Kindregan, Hale & Dorr, Boston, MA, John A. Donovan, Jr., Burns & Levinson, Boston, MA, Leonard Hersh, Lara M. Krieger, Gibson, Dunn & Crutcher, New York City, for Dooyang America, Inc.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### *INTRODUCTION*

From 1988 to 1991, defendants Dooyang Corporation, Dooyang International, and Dooyang America (collectively "Dooyang") hired plaintiff Arthur D. Little International, Inc. ("ADL") to provide business consulting services in relation to an investment in an aluminum smelter. ADL brought this action in Massachusetts state court on August 11, 1994 to collect on three unpaid bills totalling approximately $460,000, and to recover for damages incurred by reliance on Dooyang's promises to pay the bills. Dooyang removed to federal court based on diversity jurisdiction, and counterclaimed for fraud (Count I), negligent misrepresentation (Count II), negligence (Count III), breach of contract (Count IV), and unfair and deceptive trade practices under M.G.L. c. 93A (Count V),[1] claiming that ADL's intentional and negligent actions caused it to incur over $9 million in expenses. ADL has moved for summary judgment on Dooyang's second amended answer and counterclaims. After hearing, the Court *DENIES* the motion as to Counts I–IV and *ALLOWS* it as to Count V. However, the contractual limitation of liability pro-

---

**1.** An additional count of unjust enrichment was dropped from the latest amendment of the counterclaims. The Court therefore does not address it.

vision limits recovery with respect to Counts II, III, and IV. Counts II and III are also barred by the statute of limitations and therefore allowed only to set off ADL's damages.

## FACTUAL BACKGROUND

For purposes of addressing the motion for summary judgment, the Court treats the following facts as undisputed:

*The Overview*

Dooyang, a Korean corporation, hired ADL to provide assistance with a billion-dollar investment in a Venezuelan aluminum smelter. After assembling a group of investors, Dooyang entered into a competition with several other investment groups for a special subsidy awarded by the Venezuelan government. Although Dooyang and two other projects eventually obtained the subsidy rights, none of the smelter projects have been built in Venezuela.

During the period it was advising Dooyang, ADL was also assisting an arm of the Venezuelan government to attract investors to Venezuela and to evaluate the competing projects of investors, including Dooyang's. Although Dooyang knew of, and apparently thought it could benefit from, ADL's access to the government, it claims this was a conflict of interest that led ADL to breach its duties to give complete and accurate information. Dooyang blames ADL for the loss of the money expended on the project.

*The Players*

ADL is a business consulting firm incorporated in Massachusetts, with a home office in Cambridge, Massachusetts, and several branch offices including one in Caracas, Venezuela. ADL employee Frank Yans ("Yans"), a consultant with over 25 years of experience in the aluminum industry, was the ADL staff person in charge of the Dooyang assignment.

Defendants are several members of the "Dooyang Group," a group of ten associated corporations involved in steel production, real estate development, manufacturing, apparel, and international finance. The group is chaired by its founder, D.Y. Kim ("Kim"). The defendant corporations are Dooyang Corporation and Dooyang International Inc., Korean corporations based in Seoul, Korea, and Dooyang America, Inc., a New Jersey corporation with offices in New York. In 1988–89 the ten Dooyang corporations together employed approximately 2,200 people. By 1995 it employed seven or eight thousand.

Kim had some experience with aluminum investment before his involvement with the Venezuelan aluminum project. Before starting Dooyang, he had worked with ADL's Frank Yans on an aluminum project in Australia, and had also discussed aluminum projects with Canadian officials. (Ex. 4.)[2] Chul S. (Alex) Song, President of Dooyang America, was the Dooyang employee directly responsible for the Venezuelan smelter project. The Venezuelan smelter project was Dooyang America's main activity during the relevant period.

*Preliminaries: 1985–1988*

Kim first discussed the feasibility of investing in an aluminum smelter project with Frank Yans of ADL as early as 1985, when Yans recommended against the idea. (Ex. 1.) Two years later, Yans wrote to Kim to express interest in discussing the project, noting that Yans had been "very active representing the Venezuelan government aluminum industry" and that other Korean investors were looking at smelter projects in Venezuela. (Ex. 2.)

In March 1988, Dooyang and ADL entered into a letter agreement which provided that ADL would begin advising Dooyang on the feasibility of acquiring an existing aluminum smelter not in Venezuela, but in the United States or Canada. (Ex. 4.) Kim soon expressed his interest in pursuing a joint venture in Venezuela (Exs. 5, 7), prompting Yans to respond with surprise at the sudden shift in the focus of the consulting work (Ex. 8). Kim subsequently agreed that the best plan would be to get industry experience through investment in an existing smelter in

2. Unless otherwise noted, numbered exhibits and paragraphs refer to the Second Amended Answer and Counterclaims. The Court notes that this latest answer joins all relevant Dooyang entities and thereby moots ADL's argument that all contracting parties are not before the Court.

North America, while continuing to gather information about Venezuela. (Ex. 9.)

Kim had notice of the potential risks associated with investment in Venezuela in August 1988, as evidenced by a newspaper article he mailed to Yans, stating: "Venezuela's billion dollar bid to become one of the world's largest suppliers of aluminum is in danger, as economists question the competitiveness and the government investigates the honesty of the public aluminum firms." (Suppl.Kindregan Aff. Ex. E.)

*ADL's work for the Venezuelan government*

ADL informed Dooyang in 1988 that Yans was "currently working directly for the Venezuelan minister who is responsible for all energy and all metal including steel and aluminum," and a government-affiliated corporation named Corporacion Venezolana de Guayana ("CVG"), developing their strategy and making acquisitions for them. (Hersh Aff. Ex. 40.) ADL also told Dooyang that, through its work with the Venezuelan government and other clients, it had been "asked to put together two consortiums of investors for new smelting projects in Venezuela and Iceland." (Ex. 10.)

An internal ADL memo in February 1988 expressed concern over possible conflicts of interest. The author noted that ADL "may become embarrassed some day by, for example, recommending to two different clients they acquire the same company." The memo, addressed to Frank Yans, referred specifically to Dooyang, stating that "[t]his example is clearly a conflict, others may not be so clear, and guidelines for dealing with them will need to be formulated." (Hersh Aff. Ex. 66.)

According to Dooyang America president Alex Song, he and Kim discussed the conflict of interest issue with ADL at the time and decided that "ADL's involvement in CVG could help" their project "because they can do inside work." (MacDonald Aff. Ex. B at 214–16.)

*Time to invest in a new smelter*

On March 8, 1989, ADL wrote to Dooyang suggesting that it might be a good time to start investing in the construction of a new aluminum smelter, rather than joining an existing project. (Ex. 11.) ADL informed Dooyang that many major aluminum companies, including ALCOA, ALUMAX, and Austria Metall, were investigating or pursuing aluminum smelter projects in Venezuela. By March 30, 1989, Dooyang had already formally joined with EIE, a Japanese company, in a joint venture to develop an aluminum smelter in Venezuela. EIE's contribution to the venture was the securing of a letter of credit pursuant to which ADL's bills were paid on Dooyang's behalf. (Suppl.Kindregan Aff. Ex. B.)

In an April 13, 1989, letter to Dooyang, ADL related the comparative advantages of both Canada and Venezuela. Yans described Canada as "more mature in its industrial development program" and having a "more stable economic and political environment." He stated that Venezuela, on the other hand, had "the potential for major capacity additions," and "a long-term competitive cost advantage." He said that Venezuela also had "all the requisite infrastructure, access to a deep water port, low-cost hydro power, low-cost labor, indigenous bauxite and alumina." (Ex. 12.) Additionally, ADL cited the advantages of recently-created alternative financing options in Venezuela, namely, "debt-for-equity and debt-for-debt swaps," which "serve to lower the overall cost of the project."

ADL explained in the letter that other smelter projects had not gone forward in Venezuela because of "the Latin American debt crisis, the lack of available direct investment monies and the lack of alternative sources of financing" as well as the turmoil caused by recent national elections. "While we cannot predict how this situation will evolve," asserted ADL, "we believe that the country risk is manageable in the long term." ADL stated that "[m]any creative steps can be taken to eliminate such risk." Further, Yans stated: "We have a long-standing presence in Venezuela, having worked for the private sector, the CVG companies, as well as for the President of CVG who has a cabinet minister status in the Venezuelan national government." (Ex. 12.)

*ADL–CVG agreement: March 1989*

Yans' work for CVG was continuing. In March 1989, soon after recommending to Dooyang that it invest in Venezuela, ADL met with CVG to assist it in attracting international investment to the Venezuelan aluminum industry and entered into a contract with CVG to evaluate the aluminum smelter proposals of various investment groups. (Exs. 13–16.)

The parties dispute the extent of Dooyang's awareness of the precise nature of ADL's work for CVG. Except as noted, Dooyang did not receive copies of ADL's contracts with or reports to CVG until discovery in this litigation.

*ADL–Dooyang agreement: June 1989*

On June 2, 1989, ADL and Dooyang entered into the first of a series of continuous letter agreements (Ex. 18), after having exchanged drafts throughout the spring. (Second Am. Answer & Countercl. ¶ 115; Dkt. 71 at 12 n. 8.) Under this agreement, ADL contracted to advise Dooyang in the establishment of a new aluminum smelter in either Venezuela or Canada. The 8–page letter summarized ADL's role as assisting Dooyang "in the entire development of the project through preliminary financing and up to engineering bid preparations and presentation to key lending institutions." (Ex. 18 at 1.) ADL proposed an initial six-month phase during which ADL would "focus on the general project economics and the evaluation of investment alternatives in Canada ... and Venezuela." *Id.*

ADL's approach as outlined in the letter agreement was to "arrange for and participate in discussions with host governments and other local groups of concern," if necessary as Dooyang's "sole representative," to "identify and develop an understanding of the advantages and disadvantages of each location," and to incorporate the information into a financial model. *Id.* at 3–4. ADL asserted in the letter that it was "very much of the view that [Dooyang] should create a competitive situation between the potential host countries/regions to obtain the most beneficial terms and an understanding of what competing aluminum producers are considering." *Id.* at 4.

Over the course of its work on the project, ADL also undertook to lobby the Venezuelan government on Dooyang's behalf. (Yans Aff. ¶ 33.) As ADL's expert explains, "ADL was effectively the financial-engineering-construction-purchasing-transportation staff for Dooyang." (Hersh Aff. Ex. 8 at 191.) At no time, however, did ADL have the authority to enter into contracts or otherwise to make commitments on behalf of Dooyang. (Suppl. Yans Aff. ¶ 4.)

Attached to and incorporated into the June 1989 letter agreement was ADL's "General Provisions," which included the following language:

> Our work will be on a *best efforts basis.* We expect that the results will meet the objectives sought, and we have assigned to the work professional personnel having the required skills, experience and competence. Our recommendations and the written material we provide will be our *best judgment based upon the information available* to us. *In any event, our liability for damages arising out of your use of the results of our work or any recommendations we may make shall not be greater than the amount paid to use [sic] for the professional services rendered.* It is understood that prior to presentation of the results of our work to any member of the equity group, we will require written agreement of that member to the foregoing limitation of liability.
>
> Any change in this agreement shall be confirmed in writing. This agreement shall be interpreted according to the laws of the Commonwealth of Massachusetts.

(Ex. 18 (emphasis added).)

*ADL's work for Dooyang: 1989*

Although the contract spoke of a comparative analysis of Canada and Venezuela, the work soon focused solely on Venezuela. On June 15, 1989, Yans wrote to J.J. Kim, president of Dooyang International, notifying him that "seven projects have been approved by the [Venezuelan] government but none of them have been able to get their act together and most have been hampered by unprofessionalism. Only one or two are serious con-

tenders. While we must not waste any time, I can assure you that we will have no trouble getting government approval for your project given the approach we will be taking." (Ex. 19.)

On October 2, 1989, ADL reported to Dooyang the results of a preliminary study of expected returns on a Venezuelan project, predicting returns of 20 to 40 percent. (Ex. 23; *see also* Ex. 25, Preliminary Project Description presented to Potential Financial Advisors March–April 1990, at 3365 (stating same projected rate of return).)

The major product of ADL's work for Dooyang in 1989 was a two-day presentation in November. (Ex. 24.) Included in the November presentation was a September 1989 report on the socio-political outlook in Venezuela which identified several risks associated with investing in Venezuela, including political unrest, a lack of strong leadership, and a seventh consecutive year of zero economic growth. The report also included a detailed economic analysis of industrial development in Venezuela. (Ex. 22.)

On January 18, 1990, Dooyang and CVG entered into a "Protocol Agreement," which stated the parties' intent to establish a smelter in Guayana and provided that Dooyang would "hold 100% of the equity interest" but that "[s]hould C.V.G. wish participation it shall be in the order of up to 20% of the equity." (Suppl. Yans Aff. Ex. 7.)

The June 2, 1989, contract expired by its terms at the end of 1989. ADL and Dooyang extended the June 1989 agreement for an additional six months in a January 16, 1990, letter (Ex. 28), and a third six-month extension of the ADL–Dooyang contract was agreed to in a July 17, 1990, letter agreement (Ex. 39).

*ADL's representations to CVG: July 1989*

Meanwhile, Yans' work for CVG progressed. In a July 20, 1989, report to CVG, ADL stated:

> We started this project with the feeling that the situation was urgent and, frankly, rather serious. We were of the view that there may be little or no chance of starting the construction of a new smelter in Venezuela in the next several years.

> We quickly became convinced that while the situation was indeed urgent and that [sic] there was a high probability that 2 or 3 projects could be made to proceed in a few months.

> The primary impediment to progress was the inability of Venezuela to "get its act together" on a broad and coordinated front. (i.e. beyond just power and alumina contracts) For example, Canada takes 2 years.

(Ex. 21.)

ADL advised CVG, in the July 1989 report, to seek an investor who possessed "the technology, project experience, management, financial capability, and alumina all within his own organization," and suggested given these criteria that CVG focus on projects by AL-COA and ALUMAX, and consider as a third either the Cisneros/Rich or the Austria Metall project. (Ex. 20.) ADL also told CVG:

> I don't want you to think that this is a Yankee recommending other Yankee's [sic]. Our loyalties are to you. But this is the way it has worked out.

(Ex. 21.)

Dooyang did not have all these elements within its organization, but rather would be required to enter into partnerships with companies that had the necessary technology, experience, and natural resources. However, Dooyang had not yet decided to go forward with a project in Venezuela, and so had no proposal in for consideration (Kindregan Aff. Ex. A, Kim dep. at 257–58), whereas seven other projects had already been "approved" by the Venezuelan government (Ex. 19).

*Roles of ADL and Dooyang in Venezuela*

In a January 1990 letter, Yans noted that, to be successful, "Dooyang must establish its own presence in Venezuela independent in every way of ADL" and that "[i]n the long run" it was ADL's objective to do that. (Ex. 30.) In the short run, however, Yans requested that "until such time as Dooyang has realized its own independent presence in Venezuela and ADL is no longer responsible for project fulfillment within a specific budget":

1. ADL be consulted beforehand as to the advisability of, and content of, trips to Venezuela and,
2. All major interactions with the ADL Caracas office be initiated through my office.

*Id.*

Yans felt that "[o]perating in this manner will also permit us to manage what will become a complex web of negotiating and governmental relationships in an efficient manner and without tripping over our own feet. It is the only way ADL can do its job."

A few months later, in July 1990, Venezuelan ADL staff George Kastner criticized the lack of a Dooyang presence in Venezuela in an internal memo to Yans:

It is important for [Dooyang's project] to put a few people on the ground on a permanent basis. All other projects have people on the ground that maintain a continuous relationship and contact with CVG officials.... It is also important for our relationship with CVG, since it establishes a direct line between Dooyang and CVG without considering ADL to be the official representative of the Korean project. Many CVG officials consider the Korean project to be ADL's project; that is not convenient for us.

(Ex. 42.)

*ADL's negotiations with competing investors on behalf of CVG*

During this same period, ADL was actively representing CVG in negotiations with competing investors such as ALCOA. *See, e.g.,* Ex. 37 (April 13, 1990 letter from Yans to an ALCOA vice president). Dooyang was aware that ADL's work for CVG involved contacting other aluminum investors, at least by August 1990, when Yans clearly referred to conversations with other companies in his correspondence with Kim. (Ex. 40 at 2.)

*Representations regarding Venezuelan infrastructure*

In the November 1989 presentation to Dooyang, ADL reported that CVG had "promised to make ready a port and the site for the project." (Ex. 24.) On March 28, 1990, however, ADL advised Dooyang of a shortage of port facilities in Venezuela. ADL warned Dooyang that the "primary problem being encountered" with infrastructure and site research was "the fact that port facilities are *barely able to handle the requirements of three new smelters,* plus the load from other CVG activities." (Ex. 46 (emphasis added).)

A week later, ADL told CVG that preliminary information indicated that "while there may barely be enough loading/unloading (alumina, carbon and aluminum) capacity for one smelter there is *certainly not enough for two.*" (Ex. 33 (emphasis added).) ADL noted that this "will be discovered very quickly when the smelter project teams get down to the details" and expressed surprise "that no one has yet progressed to the point of asking for such a proposal." *Id.*

Later in April Yans presented to CVG some preliminary conclusions regarding infrastructure. Yans noted that at the time, CVG was "not in a position to provide a complete infrastructure package as expected by the aluminum project investors and their banks who are providing the project debt financing." (Ex. 48.) In order to expedite the projects, ADL recommended "that CVG transfer responsibility for port construction to the projects," which would cause the banks to "perceive a substantial risk reduction for the projects." ADL also noted that "investors will be seeking compensation for incurring additional cost for a port facility that had been offered by CVG."

ADL apparently convinced Dooyang to provide the port itself. On July 10, 1990, Kim sent to CVG a letter drafted by Yans which stated:

I have given some thought to the port situation and our need to have a definite arrangement in hand which convinces the banks that there is little completion risk and that we will be in control of construction. As a result I am prepared to eliminate the issue by offering CVG a "Build, Operate & Transfer" arrangement.

(Ex. 50.)

On October 31, 1990, an internal ADL memo confirmed that CVG did not have the money for port construction and that "the

willingness of the investor to build the port on a [Build, Operate, and Transfer] concept . . . is a critical factor for the [debt/equity] assignation." (Ex. 51.) On December 1, 1990, Dooyang submitted a formal proposal to construct a port. (Ex. 52.)

*Representations regarding relative status of Dooyang's project*

In April 1990, ADL wrote to CVG to compare the relative strengths and weaknesses of three smelter projects: ALCOA's ALU-SUR project, Dooyang's KOJOVAL project, and ALUMAX's ALUGUAY project. On ALCOA's project, ADL stated:

> *It is critical to understand that ALCOA is the only company which has internally all that is needed to take a decision to proceed with a smelter. They have the technology, alumina, money, market outlets, and management skills.* No one else can make that assertion. With all the other companies involved, you can never be sure they will actually proceed until the last requirement is in place. For this reason we continue to believe that it is important to give very high priority to this project.

(Ex. 33 (emphasis in original).)

On ALUMAX's project, ADL stated:

> ALUMAX is extremely interested in building more smelter capacity. They have been very active in the world market looking for sites and proposals. The Canadians were successful in getting ALUMAX to commit to a smelter last year. We must be more aggressive with them to avoid the loss of their second project.

(Ex. 33.)

On Dooyang's project, ADL's only general comments were that "this equity group is serious about the project," that they are "spending major funds to advance their position," and that ADL is "confident that they will continue to move very rapidly."

In an April 13, 1990, letter reporting on a meeting with ALCOA on behalf of CVG, ADL told CVG: "We would like to reiterate our view that this is the most important project—because ALCOA has all needed elements 'in-house' (cash, technology, alumina, management)—and therefore great effort should be expended towards its realization."

(Ex. 36.) Dooyang admits that ALCOA had more experience in aluminum manufacturing. (MacDonald Aff. Ex. A, Kim dep. at 316–17.)

In a July 1990 report to CVG, ADL reported that originally the ALCOA and ALUMAX projects were to be the two "focus" projects and that "[l]ater an attempt was made to attract the Dooyang project, which at the time was going to Canada." (Ex. 17.) ADL stated that "Dooyang was successfully attracted to Venezuela and is now one of the leading projects." *Id.*

Dooyang was aware of this characterization of it as having been "attracted" to move from Canada to Venezuela, as Yans referred to it in an August 6, 1990 letter. (Ex. 40 at 2.) By this time, Dooyang was also well aware that ADL was evaluating the competing smelter projects for CVG. For example, Yans informed Dooyang in a July 17, 1990, letter that he had "just returned from Venezuela having spent several days working with the CVG organization" and that:

> At the Minister's specific request, I spent some time briefing him and CVG V.P.'s on the status of the various smelter projects, and recommended to him organizational approaches that CVG might take *to coordinate its selection of projects to support* with those members of the government making decisions on debt/equity swaps, as well as *to be certain that CVG supports the projects that are most likely to be successful.*

(Ex. 38 (emphasis added).)

Attached to this letter to Dooyang was a partial copy of a presentation to CVG. *Id.* The part of the presentation sent to Dooyang compared Dooyang with other projects, assigning each a grade and a comment. Dooyang was shown with a "B+/A-" and described as: "Best financed project. Very committed. On fast track." ALCOA's project was rated a "D-/A+" and described as a "[w]ild card." The ALUMAX project was rated "D." *Id.* at 2432. Yans assured Dooyang in his letter that ADL had "succeeded in convincing [CVG] that the Dooyang project is the number one project to support."

*Dooyang's endeavors to secure debt/equity conversion rights*

On December 14, 1990, Dooyang submitted its proposal for a debt/equity swap, a form of government subsidy offered by the Venezuelan government, in order to build an aluminum smelter in Venezuela. (Ex. 54.) The proposal, to build a smelter on the Orinoco River, was dubbed the "Orinoco project." The equity group was comprised of five companies, including Dooyang and Kaiser Aluminum & Chemical ("Kaiser"), an aluminum manufacturer who provided the technological expertise.

In a December 18, 1990, letter, Frank Yans of ADL reported that he was "certain that Orinoco is the only submission which has met virtually all of the [Venezuelan government's] decree's requirements," explaining that others failed to submit bonds or to meet the cash equity requirements. (Ex. 55.) Yans said he had received "direct comments from the most senior CVG officials that 'Orinoco is the winner.'" He added that ADL was "cautiously optimistic," warning however that "intense lobbying by the competing projects has begun," "other projects will not give up without a fight," and "Alcoa will be particularly difficult."

Dooyang learned early in March 1991 that the Venezuelan government had rejected its application for debt/equity conversion rights in favor of ALCOA's ALUSUR project.

A day later, Dooyang Corporation's Vice President for Aluminum Investments, Richard L. Humphrey, a man with substantial experience in the aluminum field, wrote to Kim:

> The events of yesterday ... are in my mind conclusive evidence that any further pursuit of the Orinoco Project will be costly, time consuming, and fruitless.
>
> .... Prompt and decisive action offers Dooyang some hope of success in a situation where failure is the most probable eventual outcome. The lack of morality and integrity displayed by Venezuelan officials in this matter is appalling and the effrontery to you by the misleading commitments made on your last visit is unconcionable [sic].

This behavior is obviously symptomatic of the Venezuelan system and argues that it is unlikely that honorable people could successfully conduct business in that environment. I believe that anyone who counsels you to "keep trying" has something other than Dooyangs [sic] best interests in mind.

> In the final analysis the decision, of course, is yours and you may well have information that I do not, or objectives of which I am unaware. I must in fairness, tell you that I am unwilling to play any part in establishing a smelter in Venezuela regardless of the conditions.

(Aff. of Charles P. Kindregan, Ex. E.)

Nevertheless, Dooyang met with ADL in Caracas soon thereafter to discuss resubmitting its proposal. (Ex. 56.) In an April 20, 1991, letter, ADL summarized a verbal extension of the letter agreement that had expired at the end of 1990. (Yans Aff. Ex. 8.)

On March 19, 1991, Yans presented to Dooyang and ADL staff his analysis of what had gone wrong with the original application. (Ex. 56.) Yans explained that "errors were made in [the Minister's] understanding of Orinoco's financial strength"; specifically, "they were not told that the pledge of Dooyang's for up to $125 million ... was new equity from Kim." Thus the Minister had seen Dooyang's net corporate worth of $100 million and decided it was financially "not up to the task." Yans explained that "Orinoco did virtually no lobbying to explain correctly the facts regarding the project" while "[o]ur competitors had a virtual parade of visitors in front of the Ministers." "We must recognize," stated Yans, "that it is Orinoco's responsibility to communicate the facts." "If they do not know Orinoco's story, it is Orinoco's fault, not theirs." *Id.*

The Orinoco smelter proposal was resubmitted on April 26, 1991. (Ex. 57.) In June 1991, Dooyang learned that the Venezuelan government had approved the Orinoco smelter, as well as another project, the ALUYANA project. The government formally granted debt/equity conversion rights to Dooyang on July 24, 1991. Dooyang did not further extend its contract with ADL.

*Rising equity commitment and breaking up of the equity group*

The approval of debt/equity conversion rights from the Venezuelan government did not suffice to ensure the success of Dooyang's Orinoco project. Dooyang's major partners eventually pulled out of the project, and the smelter has never been built.

The projected equity commitment to the aluminum smelter investment had been steadily rising from the beginning of the project. Initially ADL suggested an investment in the realm of $800 million, of which at least $200 million would likely have to be cash equity. (Ex. 18.) In July 1990 an internal ADL memo informed Yans that Goldman Sachs [3] had projected that "the Dooyang project will require additional commitments, not necessarily equity cash, in order to be financed in an acceptable fashion." The memo continued: "This conversation was held in confidence, I disclosed neither Alisa or 1st Boston, and requested he not tell Dooyang about the conversation. Once we have spoken to Salomon Bros. we should be in the right position to draft a letter to the Minister on this topic." (Hersh Aff. Ex. 64.)

The first debt/equity application, prepared in December 1990, proposed a total of $260 million in cash equity. (Ex. 54 at 2–2.) In a March 1991 report, SNC, Dooyang's engineering consulting firm, reported that the necessary cash equity commitment to the smelter project would be approximately $378 million and the total cost over $1 billion. (Yans Aff. Ex. 14 at 8865.) Although it is unclear whether Dooyang received this report in March 1991, Kim testified that he was aware of this increase in proposed cash equity before the March 1991 rejection of the first Dooyang proposal. (Mot. for Leave to Submit Suppl. Evidence, Dkt. 63, Ex. 1, Kim Dep. vol. III at 535–36.)

The second debt/equity proposal, submitted in April 1991, incorporated a $65 million increase in equity commitment over the previous proposal, for a total cash equity commitment of $325 million. (Ex. 57.) Finally, in September 1991, Goldman Sachs recom-

mended another increase from $325 to $388 million, and a total investment of $1.2 billion. (Affirmation of Park ¶ 16.)

Also in September 1991, EIE, Dooyang's equity partner, pulled out of the project. (Hersh Aff. Ex. 70.) EIE president Nagy Azar wrote to Kim expressing his concern that the project had not yet developed into anything concrete. Kim signed an agreement to buy Azar out by repaying the $2,216,500 Azar had paid to ADL as his investment in the project. The payment was to be made by August 1996, with no interest.

Kaiser Aluminum, Dooyang's partner with the technological expertise, became unwilling to provide its share of the equity and withdrew from the project in March 1992, about a month after an attempted coup by the Venezuelan military. (Affirmation of Park ¶ 21; Kindregan Suppl. Aff. Ex. A.)

Dooyang pursued the project at least through September 1993. (Kindregan Suppl. Aff. Ex. A, Kim dep. at 793; Ex. D.) At that time, Dooyang was delaying the submission of a proposal for financing because the price of aluminum had fallen so much in 1993 that the project had become infeasible. *Id.* None of the proposed smelter projects have actually been built in Venezuela. (Hersh Aff. Ex. 15 at 2.)

*Billing and investment*

Dooyang, through EIE, paid over $2.2 million to ADL for its work. ADL's final invoices of April 1991, May 1991, and June 1991, totalling approximately $460,000, have not been paid. In all, Dooyang incurred costs of over $9 million in connection with the Orinoco project (including fees paid to ADL). (Affirmation of Park ¶ 22.)

## DISCUSSION

*Summary judgment standard*

■ "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

**3.** In addition to ADL, Dooyang worked with several other advisors, including Goldman Sachs and Citibank (financial analysis), Baker & Mac-

Kenzie (legal advice), and SNC (engineering consultants).

fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

■ "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

*Breach of contract (Counterclaim IV)*

■ Dooyang claims that ADL has breached the duties to which it explicitly agreed by contract as well as the implied covenant of good faith and fair dealing. *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473, 583 N.E.2d 806 (1991) (every contract in Massachusetts is subject to the implied covenant of good faith and fair dealing). In order to collect damages for breach of contract, Dooyang must prove that there was a valid contract, that ADL breached its duties under the contract, and that Dooyang was damaged by the breach. *See Monadnock Display Fireworks, Inc. v. Andover*, 388 Mass. 153, 156, 445 N.E.2d 1053 (1983). "[W]hether a party substantially complied with the terms of a contract or whether the actions of a party constitute a material breach is a question of fact." *O'Connell Management Co. v. Carlyle–XIII Managers, Inc.*, 765 F.Supp. 779, 783 (D.Mass.1991).

ADL does not dispute that there is a valid contract. In addition to delineating its role as general project advisor, ADL contracted to use "best efforts" in its work, and to provide its "best judgment based upon the information available" to it. *Cf. Monadnock*, 388 Mass. at 156, 445 N.E.2d 1053 (jury finding that defendant was negligent established breach of contractual obligation to "employ reasonable measures" to carry out duties); *Macksey v. Egan*, 36 Mass.App.Ct. 463, 472 & n. 16, 633 N.E.2d 408 (upholding a jury instruction defining "best efforts" as "what is reasonable in the circumstances"), *review denied*, 418 Mass. 1104, 638 N.E.2d 913 (1994). ADL argues that it is entitled to summary judgment on the counterclaim because the undisputed facts evidence no breach of these contractual duties.

■ Interpreted in the light most favorable to Dooyang, the evidence shows, among other things, that ADL told Dooyang its project was in the lead at a time when ADL knew ALCOA's project to be CVG's priority; that ADL was not using its "best efforts" to promote Dooyang's project, but instead was advising that the ALCOA project prevail; and that ADL was not giving accurate information about key issues like port capacity. Dooyang has thus raised genuine disputes of material fact as to whether ADL breached its contractual duties and whether the breach caused Dooyang injury.

■ Under ADL's "General Provisions," attached to the contracts at issue, its "liability for damages arising out of [Dooyang's] use of the results of [ADL's] work or any recommendations [ADL] may make shall not be greater than the amount paid to [ADL] for the professional services rendered." The damages on the contract claim are therefore limited to the amount paid to ADL under the contract. *Cf. Deerskin Trading Post, Inc. v. Spencer Press, Inc.*, 398 Mass. 118, 124, 495 N.E.2d 303 (1986) (limiting damages to a refund of the purchase price where the two

parties are sophisticated business entities and where consequential damages could be extensive is a reasonable business practice). Summary judgment on Count IV is *DE-NIED.*

*Negligence (Counterclaim III)*

Dooyang argues essentially that "[h]ad ADL provided Dooyang with accurate and complete information and told Dooyang the same story that ADL was telling CVG, Dooyang would not have wasted over $9 million on a failed project." (Dkt. 57 at 23; *see also* Second Am. Answer & Countercl. ¶¶ 334, 346, 357.) ADL argues that this claim is barred by the economic loss rule.

■ Under longstanding Massachusetts law, "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *FMR Corp. v. Boston Edison Co.,* 415 Mass. 393, 395, 613 N.E.2d 902 (1993) (rejecting claims for economic losses of a business arising out of power outages); *New England Power Co. v. Riley Stoker Corp.,* 20 Mass. App.Ct. 25, 35, 477 N.E.2d 1054 (rejecting negligence claim for economic loss arising from claim that defendant negligently performed its obligations under a contract), *rev. denied,* 395 Mass. 1103, 481 N.E.2d 197 (1985); *see also Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50, 51 (1st Cir.1985) (no tort action could be maintained under Massachusetts law to recover damages for financial harm arising out of negligently caused fuel spill); *see generally Public Service Enterprise Group, Inc. v. Philadelphia Electric Co.,* 722 F.Supp. 184, 207–08 (D.N.J. 1989) (discussing extensively the confusion surrounding the economic loss rule). "[T]he law restricts liability for ... negligently-caused economic harm, though at the same time, it permits recovery for such harm in special circumstances, for example, where the defendant engages in an intentional tort, where physical harm accompanies economic loss, or where the defendant publishes false and disparaging statements." *Canal Electric Co. v. Westinghouse Electric Co.,* 973 F.2d 988, 998 (1st Cir.1992) (citations omitted) (giving as an example of purely economic loss the extensive economic harm to commuters delayed by a negligently caused car accident); *Barber,* 764 F.2d at 51.

■ Where there is contractual privity between the parties, the economic loss rule is "founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover for damages caused by a breach of the contract." *South Carolina Electric & Gas Co. v. Westinghouse Electric Corp.,* 826 F.Supp. 1549, 1557 (D.S.C.1993); *cf. Morgan v. Financial Planning Advisors, Inc.,* 701 F.Supp. 923, 927–28 (D.Mass.1988) (barring a claim for negligent provision of services when the parties were in privity). As the Supreme Court said in *East River Steamship v. Transamerica Delaval,* 476 U.S. 858, 872–73, 106 S.Ct. 2295, 2302–03, 90 L.Ed.2d 865 (1986): "Contract law ... is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements.... Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk." *See generally Collins v. Reynard,* 154 Ill.2d 48, 180 Ill.Dec. 672, 675, 607 N.E.2d 1185, 1188 (1993) (Miller, J., concurring); W. Prosser & W. Keeton, *Prosser and Keeton on Torts* § 92 at 657 (5th ed. 1984) (recovery of intangible economic losses is generally determined by contract rather than tort law).

■ Although Massachusetts courts have permitted recovery of economic loss arising from negligence in the area of professional malpractice, *see, e.g., Frank Cooke Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 109, 406 N.E.2d 678, 685 (1980) (discussing claim of accounting malpractice resulting in economic loss but barred by statute of limitations), Dooyang cites no Massachusetts case that recognizes a professional malpractice claim against a business consultant. *Cf. Columbus McKinnon Corp. v. China Semiconductor Co., Ltd.,* 867 F.Supp. 1173, 1182–83 (W.D.N.Y.1994) ("There is no basis in law for extending the doctrine of professional malpractice to cover independent computer consultants."). The First Circuit has emphasized that "litigants who reject a state forum in order to bring suit in federal court under

diversity jurisdiction cannot expect that new trails be blazed." *Jordan v. Hawker Dayton Corp.*, 62 F.3d 29, 32 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 913, 133 L.Ed.2d 844 (1996). I decline to recognize a cause of action not yet adopted by the state court and therefore decline to hold that the doctrine of professional malpractice covers business consultants.

▆▆▆ Even outside of the professional malpractice context, however, Massachusetts courts have upheld tort claims to recover economic losses from negligent breach of contractual duties. *See Abrams v. Factory Mutual Liability Ins. Co.*, 298 Mass. 141, 144, 10 N.E.2d 82 (1937) (allowing both contract claim for insurer's breach of contractual duty to defend and tort claim for negligent performance of contractually assumed duties). In such cases, the scope of the duty owed from one contracting party to the other is defined by the terms of the contract. *Id.* ("Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort."); *cf. Somerset Sav. Bank v. Chicago Title Ins. Co.*, 420 Mass. 422, 430, 649 N.E.2d 1123 (1995) (a title insurance company's duty to the insured "is limited to the policy, and it will generally not be liable for negligence in searching the records" unless it has voluntarily assumed extra-contractual duties). Applying the above principles, this Court concludes that Massachusetts law permits a cause of action to recover economic losses caused by negligent breach of a contractual duty. Summary judgment is therefore denied.[4]

However, as *Abrams* makes clear, to the extent there is a negligence claim at all between contracting parties, it is measured by the terms of the contract. *Abrams*, 298 Mass. at 144, 10 N.E.2d 82. This is especially apparent in this case, where the negligence claim essentially restates the factual allegations of the breach of contract claim. The Court holds, therefore, that the negligence claim is limited by the contractual damages limitation to the amount paid to ADL under the contract. *See* Ex. 18 (limiting liability for "damages arising out of [Dooyang's] use of the results of [ADL's] work"); *Hill Constr. Corp. v. American Airlines, Inc.*, 996 F.2d 1315, 1316–19 (1st Cir. 1993) (holding that clause in air carriage contract that limited liability for cargo "lost, damaged, or delayed" to $9.07 per pound, applied to limit damages for carrier's negligence).

The next question is whether the three-year statute of limitations in G.L. c. 260 § 2A limits recovery. ADL argues that the tort claims are barred by the statute of limitations and therefore limited to a set-off to ADL's damages. *See* M.G.L. c. 260 § 36. In Massachusetts, "actions of tort . . . shall be commenced only within three years next after the cause of action accrues." M.G.L. c. 260 § 2A. The statute of limitations on counterclaims is computed as if the counterclaims were filed at the time the plaintiff's action was commenced. *See* M.G.L. c. 260 § 36.

▆▆▆ As the complaint in this case was filed August 11, 1994, ADL is entitled to summary judgment (except to the extent of a set-off) if the undisputed facts indicate that the counterclaim accrued before August 11, 1991. The usual rule is that a cause of action in tort accrues at the time the plaintiff sustains some injury as the result of a wrongful act on the part of the defendant. *See Frank Cooke, Inc. v. Hurwitz*, 10 Mass.App.Ct. 99, 109, 406 N.E.2d 678 (1980); *see also Massachusetts Elec. Co. v. Fletcher, Tilton & Whipple, P.C.*, 394 Mass. 265, 268, 475 N.E.2d 390 (1985).

▆▆▆ However, if the injury or its cause was not immediately apparent, the "discovery rule" applies and the cause of action does not accrue until the plaintiff knew or could have known of both the injury and the cause of the injury. *See Bowen v. Eli Lilly*, 408 Mass. 204, 205–06, 557 N.E.2d 739 (1990). "The plaintiff need not know the full extent of the injury before the statute begins to

---

4. Of course, Dooyang shall not be permitted double recovery, in both contract and tort, for the same harm.

run." *Id.* at 206, 557 N.E.2d 739. Nor need the plaintiff be on notice of a breach of duty. *See Fidler v. Eastman Kodak Co.,* 714 F.2d 192, 199 (1st Cir.1983). In order for the statute to run, a plaintiff must have "(1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was." *Bowen,* 408 Mass. at 208, 557 N.E.2d 739. "The rule does not suspend the running of the limitations period pending confirmation of the plaintiff's injury or its cause, but simply stops the clock until the occurrence of 'an event or events … that were reasonably likely to put the plaintiff on notice that someone may have caused her injury.'" *Cambridge Plating Co. v. Napco, Inc.,* 991 F.2d 21, 28–29 (quoting *Bowen,* 408 Mass. at 207, 557 N.E.2d 739).

■ Dooyang alleges that ADL acted negligently by providing Dooyang with incomplete, inadequate or inaccurate advice or information about the risks of investing in Venezuela, the availability of debt/equity conversion rights, the capital costs of Dooyang's smelter project, and the financial viability of the project (¶ 353). By March, 1991, as evidenced by Dooyang's Vice President Humphrey, Dooyang was well aware that it was injured by ADL with respect to negligent advice, particularly with respect to the debt/equity issue. There are no allegations with respect to any breaches of duty after that date. The last invoice was in June, 1991. Dooyang argues that it did not know that the equity needed on the project would be $400 million until September 1991. Even if true, Dooyang did not have to know the full extent of the injury for the statute to run. Also, ADL points out that chairman Kim admitted he knew that ADL's cost estimate was substantially understated by March, 1991. (Dkt. 63.) Accordingly, the counterclaim is time-barred. *See* G.L. c. 260, § 36. Although Dooyang argues that the statute of limitations was tolled by fraudulent concealment, there has been no concealment of information necessary to this counterclaim. Indeed, unlike the fraud counterclaim, which relies in part upon information first disclosed by ADL in 1995, no additional information relevant to the negligence claim was disclosed by ADL to Dooyang before this counterclaim was filed.

Because this counterclaim arises out of the same transaction or occurrence as the claims in the complaint, it remains as a set-off to ADL's damages. *See* M.G.L. c. 260 § 36 ("[A] counterclaim arising out of the same transaction or occurrence that is the subject matter of the plaintiff's claim, to the extent of the plaintiff's claim, may be asserted without regard to the provision of law relative to limitations of actions."). .

For the foregoing reasons, summary judgment on the counterclaim of negligence is ***DENIED.***

*Negligent misrepresentation (Counterclaim II)*

■ The Massachusetts courts have long recognized the tort of negligent misrepresentation. *See Lawton v. Dracousis,* 14 Mass. App.Ct. 164, 165, 437 N.E.2d 543 (1982) (citing Restatement (Second) of Torts § 552(1) (1977)), *rev. denied,* 387 Mass. 1103, 440 N.E.2d 1177 (1982). A plaintiff with a cause of action for negligent misrepresentation is entitled to recover for the pecuniary loss he suffers as a result. *See Danca v. Taunton Savings Bank,* 385 Mass. 1, 9–10, 429 N.E.2d 1129 (1982) (noting that the *Restatement (Second) of Torts* § 552B(1) (1977) provides "the correct rule" of damages for negligent misrepresentation cases). Thus the economic loss rule does not apply in this context. As *Barber* pointed out: "Awarding damages for financial harm caused by negligent misrepresentation is special in that, without such liability, tort law would not exert significant financial pressure to avoid negligence; a negligent accountant lacks physically harmed victims as potential plaintiffs." *Barber,* 764 F.2d at 56 (citing Atiyah, *Negligence and Economic Loss,* 83 L.Q. 248, 249 (1962)).

■ ADL also argues that there can be no negligent misrepresentation because its statements concerned matters of "opinion, estimate or judgment." *Logan Equipment Corp. v. Simon Aerials, Inc.,* 736 F.Supp. 1188, 1199 (D.Mass.1990). Even a statement of opinion is actionable, however, "if it may reasonably be understood by the recipient as implying that there are facts to justify the

opinion or at least that there are no facts that are incompatible with it." *McEneaney v. Chestnut Hill Realty Corp.*, 38 Mass.App. Ct. 573, 575, 650 N.E.2d 93 *rev. denied*, 420 Mass. 1107, 652 N.E.2d 146 (1995). Because at least some of the alleged misstatements (i.e., port capacity) implied that ADL had information to support them, the counterclaim is viable. Accordingly, the motion for summary judgment on the counterclaim of negligent misrepresentation must be denied.

■ However, this counterclaim will also be limited by the contractual damages limitation. In *Standard Register Co. v. Bolton Emerson, Inc.*, 38 Mass.App.Ct. 545, 649 N.E.2d 791 (1995), the court reaffirmed that a limitation of liability provision in a commercial contract limited recovery on a claim under G.L. c. 93A which was "merely an alternative theory of recovery under the contract." *Id.* at 549, 649 N.E.2d 791 (citing *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 379, 548 N.E.2d 182 (1990) (holding that a limitation of liability provision in a commercial contract could bar recovery for a claim under G.L. c. 93A, § 11, arising from a breach of contract warranty)). In contrast, the Court held that "a chapter 93A claim analogous to a tort-based recovery overrides any contractual defenses." *Id.* The *Standard Register* court held that an intentional misrepresentation in the inducement of a contract was not limited by a contractual damage limitation, in part because "[t]he facts supporting the deceitful conduct of the defendants which are the basis of the 93A claim are distinct from those giving rise to the breach of contract claim." *Id.* at 550, 649 N.E.2d 791. *Standard Register* suggests that a court must analyze the facts underlying a claim to determine whether tort or contract elements of the claim predominate, and whether a limitation of liability provision in the contract therefore bars recovery for alleged unlawful activity. *Id.*

Here, the allegations of negligent misrepresentation mirror the claims of breach of contractual obligations to provide consulting services and negligent provisions of such services. Unlike *Standard Register,* this is not a claim of misrepresentation in the inducement of the contract, or with respect to an issue ancillary to the contract. Rather, the same facts underlie this claim and the contract claim. Dooyang alleges, for example, that ADL negligently misrepresented the investment risk, inflation rate, capital costs, volatility of prices, and rate of return (¶ 343), all of which is information that ADL contracted to use its best efforts to provide. This Court concludes that Dooyang's damages on this counterclaim are limited by the limitation of liability provision in the contract. The counterclaim is also barred by the statute of limitations for the reasons discussed above, in the context of the negligence counterclaim, and thus remains only as a set-off to ADL's damages.

For the foregoing reasons, summary judgment on the counterclaim for negligent misrepresentation is **DENIED.**

*Fiduciary duty*

■ Dooyang also argues that "by agreeing to assist CVG in attracting foreign investment to Venezuela's aluminum industry, ADL breached its fiduciary duties" as an agent. (Dkt. 57 at 22, Dkt. 77 at 14.) Breach of fiduciary duty is not pled as a separate count, nor are the duties of an agent or a fiduciary once mentioned in the 99–page Second Amended Answer and Counterclaims. The Court will not therefore consider breach of fiduciary duty as a separate negligence claim. *Cf. Federal Sav. & Loan Ins. Corp. v. Shelton,* 789 F.Supp. 1360, 1366 n. 33 (M.D.La.1992) (breach of fiduciary duty is per se negligent). The Court will, however, address the claimed fiduciary relationship between the parties in the context of fraudulent concealment.

*Fraud (Counterclaim I)*

■ The economic loss rule does not apply to harm caused by intentional misrepresentations. *See Canal Electric,* 973 F.2d at 998; *Barber,* 764 F.2d at 56. Under Massachusetts law, a damage limitation clause in a contract does not bar recovery for intentional misrepresentation in the inducement of a contract. *VMark Software, Inc. v. EMC Corp.,* 37 Mass.App.Ct. 610, 619 n. 11, 642 N.E.2d 587 (1994).

Dooyang has two claims of fraud. First, it claims that "during negotiations preceding the execution of the agreement," ADL defrauded it into entering into the written agreement dated June 2, 1989. (¶ 325.) Second, it claims that ADL made fraudulent material misrepresentations so that Dooyang would continue to use ADL's services to construct an aluminum smelter in Venezuela. These alleged fraudulent misrepresentations concerned ADL's relationship with CVG, the true status of Venezuela's aluminum expansion plan, and ADL's role in promoting that plan.

■ ADL argues that the fraud claim is time-barred, while Dooyang argues that the statute of limitations is tolled by ADL's fraudulent concealment of the facts underlying this claim. In Massachusetts, statutes of limitations are tolled by statute until actual discovery if there has been fraudulent concealment of the cause of action. *See* M.G.L. c. 260 § 12.[5] Generally fraudulent concealment requires an affirmative act of concealment; mere silence is not enough. *See Tagliente v. Himmer*, 949 F.2d 1, 6 (1st Cir. 1991). If there is a fiduciary duty to disclose, however, failure to disclose may toll the statute until actual discovery. *See Puritan Medical Center v. Cashman*, 413 Mass. 167, 175, 596 N.E.2d 1004 (1992).

*Fraudulent inducement of the June 2, 1989 agreement*

■ With respect to the claim of fraudulent inducement of the June 2, 1989 agreement, Dooyang alleges four material misrepresentations. The first springs from a letter dated April 13, 1989. (¶ 331(a).) Dooyang claims that ADL falsely represented its relationship with CVG and the reasons why Dooyang should invest in the Venezuela aluminum industry, and failed to disclose that ADL had a contract with CVG to assist in attracting smelter projects to Venezuela. However, Dooyang knew that ADL was assisting CVG to attract investments for new smelting projects in 1988, and decided that

this inside pull would help its project prior to entering into the consulting project. While Dooyang did not see the written contract between ADL and CVG, there is no evidence that the scope of work was different from what Dooyang understood.

■ Dooyang also relies on two communications from Yans to Kim, dated April 13, 1989 and March 28, 1990, suggesting that Venezuela had the requisite infrastructure, including access to the deep water port and sufficient port facilities for three aluminum smelters, when it knew in early 1990 that there was "barely enough loading and unloading capacity for one smelter, much less two or three." (¶ 331(b).) However, there is no evidence that ADL knew that the port infrastructure was inadequate prior to entering into the agreement in June 1989.

■ The third claim of fraudulent inducement of the June 1989 contract is premised on the April 13, 1989 letter from Yans to Kim in which ADL represented to Dooyang that CVG would be interested in buying a minority equity position in Dooyang's project. There is no evidence that at the time this statement was made it was false. Indeed, in January 1990, Dooyang and CVG signed an agreement stating that if CVG wished to participate in the project, it could assume up to 20% of the equity. (Suppl. Yans Aff. Ex. 7.) Dooyang points to a July 1990 ADL report in which ADL advised CVG to invest as little equity as possible in the smelter projects. While Dooyang fairly argues that this is evidence of a breach of the promise to use "best efforts" to "maximiz[e]" the local incentive package," it does not support a claim of fraudulent inducement of the contract entered into a year before this report.

Finally, Dooyang argues in its memorandum that in March, 1989, ADL believed and told CVG that there was "little or no chance of constructing a new smelter in Venezuela in the next several years," but failed to disclose its position to Dooyang. However, Dooyang (disturbingly) fails to quote the *whole* exhibit:

---

5. The statute reads:
   If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring

it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

We started this project with the feeling that the situation was urgent and, frankly, rather serious. We were of the view that there may be little or no chance of starting the construction of a new smelter in Venezuela in the next several years.

*We quickly became convinced* that while the situation was indeed urgent and that [sic] there was a high probability that 2 or 3 projects could be made to proceed in a few months.

(Ex. 21 (emphasis added).)

The claim that ADL fraudulently induced Dooyang to sign the June 2, 1989, contract thus fails on the merits.

*Fraudulent misrepresentations post June 2, 1989*

Dooyang also alleges that it was damaged by its reliance upon fraudulent misrepresentations made by ADL during the course of the contract. In contrast to the count of negligent misrepresentation, which involved primarily allegations of mistaken economic analyses, Dooyang has produced evidence of at least two written statements that appear to be knowingly false or misleading. For example, on April 13, 1990, Frank Yans of ADL wrote the minister of CVG about AL-COA. "We would like to reiterate our view that this is the most important project—because ALCOA has all needed elements 'in-house' (cash, technology, alumina, management)—and therefore, great effort should be expanded towards its realization." (Hersh Aff., Vol. II, Ex. 30.) Yet, on July 17, 1990, Mr. Yans writes to Dooyang's Chairman Kim: "I have succeeded in convincing the minister that the Dooyang project is the number one project to support." (*Id.* at Ex. 33, plus attachments describing strengths and weaknesses of ALCOA and Dooyang projects.)

A second alleged misrepresentation involves the sufficiency of the port facilities. On March 28, 1990, ADL informed Dooyang about the infrastructure: "The primary problem being encountered is the fact that port facilities are barely adequate to handle the requirements of three new smelters, plus the load from other CVG activities." (*Id.*, Ex. 27.) Yet, one week later, Yans of ADL wrote CVG on April 4, 1990: "On behalf of the CVG, ADL has been engaged in the examination of the infrastructure capacity associated with the various plant sites being suggested and we are very concerned regarding the preliminary information with which we have been provided. It suggests strongly that while there may barely be enough loading/unloading (alumina, carbon and aluminum) capacity for one smelter, there is certainly not enough for two." (*Id.*, Ex. 28.)

As for the three-year statute of limitations on fraud claims, the March 1991 award of debt/equity rights to ALCOA put Dooyang on notice that CVG did not consider Dooyang's project to be number one. At least by that time, Dooyang was also on notice that the equity commitment would be higher than anticipated, and that the Venezuela project was a risky investment. ADL argues that Humphrey's letter, combined with the slow progress of the project, provided Dooyang with "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved." *Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir.1978). In rebuttal, however, Dooyang points out that it did not learn of the fraud until the document production in March, 1995. It argues that ADL had a fiduciary duty of disclosure and that the statute of limitations was thereby tolled by fraudulent concealment.

■ There is sufficient evidence in the record to create a fact dispute as to whether ADL, by acting as Dooyang's "sole" representative and lobbyist in Venezuela, went beyond the typical business consultant-client relationship to become Dooyang's agent. *Cf. Restatement (Second) Agency* § 1 ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."); *Frontier Management Co., Inc. v. Balboa Ins. Co.*, 658 F.Supp. 987, 990 (D.Mass.1986) ("While an arms length business relationship generally will not give rise to fiduciary duties, if one party is an agent of the other, the agent will be a fiduciary with respect to all matters within scope of agency.").

An agency relationship would impose upon ADL a duty to disclose any conflict of interest. *See Restatement (Second) Agency* § 13, cmt. a. ADL did disclose the heart of the conflict to Dooyang. Dooyang America President Song testified that the conflict was discussed at the outset of the consultancy. Dooyang was fully aware of the nature of ADL's work for CVG at least by July 1990, if not sooner. *See* Ex. 38 (letter to Kim referring to Yans' recommendations to CVG regarding "its selection of projects to support" and enclosing ADL's evaluations of the projects).

■ However, ADL's disclosure of the conflict does not absolve ADL of all other fiduciary duties as an agent. Even if the principal consents to the agent's acting for another principal, the agent still "has a duty to act with fairness to each and to disclose to each all facts which he knows or should know would reasonably affect the judgment of each in permitting such dual agency, except as to a principal who has manifested that he knows such facts or does not care to know them." *Restatement (Second) Agency* § 392.

Under these principles, as Dooyang's agent, ADL had the duty to inform Dooyang of all facts which it knew would reasonably affect Dooyang's judgment in permitting ADL to represent both Dooyang and CVG; for example, the priority status of the ALCOA project and the problems with infrastructure. As there is at least a factual dispute as to whether this information was fraudulently concealed in breach of a fiduciary duty, and whether Dooyang was thereby prevented from discovering its fraud claim, this fraud claim is not barred by the statute of limitations.[6]

In sum, summary judgment on Count I of the counterclaims is *DENIED.* The claim shall be limited to the allegations of fraud during the course of the contract, rather than in the inducement of the contract.

*Unfair and deceptive trade practices (Counterclaim V)*

Finally, Dooyang alleges a violation of Massachusetts' consumer protection statute, M.G.L. c. 93A. ADL argues that Dooyang's c. 93A claim fails because the action upon which it is based did not occur "primarily and substantially" within Massachusetts. *See* M.G.L. c. 93A § 11. As counterclaim defendant, ADL bears the burden of proof on this element. *See* M.G.L. c. 93A § 11 ¶ 8.

■ The three factors considered by courts in determining whether action occurred primarily and substantially in Massachusetts are: 1) where the defendant committed the deceptive acts and practices; 2) where the plaintiff received and acted upon the deceptive or unfair statements; and 3) the situs of the plaintiff's losses due to the unfair or deceptive acts or practices. *Clinton Hospital Ass'n v. Corson Group, Inc.,* 907 F.2d 1260, 1264–65 (1st Cir.1990); *Charles River Data Systems, Inc. v. Oracle Complex Systems Corp.,* 788 F.Supp. 54, 61 (D.Mass.1991).

■ Interpreted in the light most favorable to Dooyang, the evidence in the record shows that ADL was based in Cambridge, that all of ADL's reports were generated in Cambridge, that ADL's decisions were made in Cambridge, that there were meetings of the parties in Massachusetts, and that Dooyang was required to direct its contact with Venezuela through the Cambridge office of ADL—generally that ADL's work, and therefore any deception by ADL, was in Massachusetts. Thus the first factor weighs in favor of Dooyang.

The second and third factors, however, weigh heavily against Dooyang, as it has no office in Massachusetts. It received and acted upon representations by ADL either in its New York office, in Korea, or in Venezuela. Further, any losses suffered by Dooyang were suffered in one of these three places, and not in Massachusetts. As in many cases, "non-Massachusetts residents are here attempting to recover for the allegedly unfair trade practices of a corporation in Massachusetts, under a statute designed to protect against in-state frauds." *Compagnie De Re-*

---

**6.** Although the statute of limitations may be tolled beyond March 1991, Dooyang's ability to recover damages for reliance after this date is questionable, as the "storm warnings" in March 1991 significantly reduce the reasonableness of any further reliance by Dooyang.

*assurance D'Ile de France v. New England Reinsurance Corp.,* 57 F.3d 56, 90 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995). Although "courts should not make the place of injury or loss determinative," *Clinton Hospital Ass'n,* 907 F.2d at 1266, the place where the claimant received and acted upon the deceptive statements is the more important consideration. *See Compagnie De Reassurance,* 57 F.3d at 90; *Bushkin Assoc., Inc. v. Raytheon Co.,* 393 Mass. 622, 638, 473 N.E.2d 662 (1985) (holding that "statements made in Massachusetts but received and acted on in New York" did not constitute actions primarily and substantially in Massachusetts).

On balance, the undisputed facts show that any deceptive acts and practices did not occur primarily and substantially within Massachusetts. ADL's motion for summary judgment on the Chapter 93A counterclaim, Count V, is *ALLOWED.*

### ORDER

Plaintiff-counterclaim defendant ADL's motion for summary judgment as to Count V of Dooyang's counterclaims is *ALLOWED.* The motion is *DENIED* with respect to the remaining counts.