Laurice J. EZRATTY, et al.,
Plaintiffs, Appellants,

v.

The COMMONWEALTH OF PUERTO RICO, et al., Defendants, Appellees.

No. 80–1571.

United States Court of Appeals,
First Circuit.

Argued Feb. 4, 1981.
Decided May 8, 1981.

---

Harry A. Ezratty, San Juan, P. R., for appellants.

Reina Colon De Rodriguez, Asst. Sol. Gen., Dept. of Justice, San Juan, P. R., with whom Hector A. Colon Cruz, Sol. Gen., San Juan, P. R., was on brief, for appellees.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

On May 9, 1978, Laurice Ezratty (and her mother, Roberta) filed this action against the Commonwealth of Puerto Rico, the Puerto Rico Department of Education, and its Secretary, Carlos Chardon, claiming that the Department had unlawfully denied her aid to which she was entitled under the Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1401 *et seq.* After trial, the district court dismissed the complaint without prejudice, primarily on the ground that plaintiffs should exhaust their remedies before the agency prior to pursuing a court action. We affirm the dismissal without prejudice.

## I.

The facts of this case can be best understood against the background of the statute. The Education of the Handicapped Act creates a federal grant program administered by states (and Puerto Rico) when they choose to participate. In 1975 Congress amended this statute by passing the Education for All Handicapped Children Act ("EHCA" or "the Act"), which significantly expanded the program's scope and imposed a series of requirements upon recipient states.[1] A state, for example, must file a plan which, among other things, sets "forth in detail" how the state will "assure that ... a free appropriate public education will be available for all handicapped children between the ages of three and eighteen within the State not later than September 1, 1978 ...." 20 U.S.C. § 1412(2)(B).[2] This assistance is to be made available to children in private, as well as public, schools, "at no cost to their parents or guardian". 20 U.S.C. § 1413. The precise nature of the assistance is to be worked out on an individual basis for each child and is to be embodied in an "individualized educational program" ("IEP"). The state must also provide a set of "procedural safeguards": A parent is given the right to obtain an "independent educational evaluation" of the child. If the parent objects to the IEP that the state has worked out for his child, he is entitled to "an impartial due process hearing" provided by the state (or local) agency, but conducted by someone other than "an employee of such agency or unit involved in the education or care of the child." 20 U.S.C. § 1415(b)(2). If the parent is "aggrieved by the findings and decision" made by the independent hearing examiner, he may bring an action "in any state court of competent jurisdiction or in a district court of the United States" and the court, after hearing additional evidence if requested, "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). If a state fails to comply with these, or other, statutory requirements, the Department of Education can withhold federal funds from the state. 20 U.S.C. § 1416.

In August 1977 the Department of Health, Education and Welfare issued a set of regulations under the EHCA, binding upon the Commonwealth of Puerto Rico as a recipient of funds under the Act. See 45 C.F.R. Part 121a. (1979). The regulations make clear that recipient states are indeed expected to make educational benefits available to all handicapped children between the ages of three and eighteen by September 1978. The regulations define "free and appropriate public education" and make clear that the state has broad discretion to use private or public agencies, schools, teachers, or facilities to provide services to the individual child. The regulations also specify how the state (or local) agency is to develop the "individualized education program". An agency representative, qualified in the field of special education, is to meet with the child's teacher, parents, and the child, where appropriate. This, and subsequent meetings where needed, will lead to an IEP tailored to the individual child. Similar meetings to review the program are to be held once a year. Finally, the regulations set out in detail how a dissatisfied parent can obtain an independent educational evaluation of the child, and, if necessary, obtain an independent review of the agency's decisions

---

1. See generally S.Rep. No. 168, 94th Cong., 1st Sess., reprinted in [1975] U.S.Code Cong. & Ad.News 1425; Krass, The Right to Public Education for Handicapped Children: A Primer for the New Advocate, 1976 U. of Ill.L.Forum 1016; Note, Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103 (1979); Note, The Education for All Handicapped Children Act of 1975, 10 Mich.J. of L.Ref. 110 (1976). The legislative background is explored in Lora v. Board of Ed. of City of New York, 456 F.Supp. 1211, 1224–28 (E.D.N.Y.1978), vacated, 623 F.2d 248 (2d Cir. 1980).

2. The Act further sets a target date of September 1, 1980 for implementation of state programs for all handicapped children between the ages of three to twenty-one, with the proviso that a free appropriate education need not be provided for handicapped children aged three to five and aged eighteen to twenty-one, where such a requirement is inconsistent with state law or practice. 20 U.S.C. § 1412(2)(B).

through a "due process" hearing with numerous procedural protections. They set deadlines for various stages of the process to expedite the creation of a satisfactory IEP, and they foresee possible court review at the end of the internal procedural road.

Plaintiff Laurice Ezratty is a handicapped child, suffering from a severe learning disability. Her parents, who reside in Puerto Rico, sent her to a specialized private school in Vermont. In the Fall of 1977 her mother contacted the Puerto Rico Department of Education to see if Laurice could receive financial assistance for private placement outside Puerto Rico under the Act. She was advised that this could not be done. After various communications and an informal meeting, Laurice was brought back to Puerto Rico, at her parents' expense, for an evaluation by Department experts in December. After several weeks passed, her parents apparently became disturbed by the fact that nothing further seemed to be happening. And, on April 10, 1978, Laurice's father, Harry Ezratty (an attorney who is handling this action) wrote to the Department, asking for a decision on his daughter's case and warning of possible legal action. The Department responded to the letter, stating that the "great number of children referred to our multidisciplinary team ... for evaluation" and the absence of an examining psychologist on maternity leave "did not permit us sufficient time to review your daughter's case." The Department added that the meeting held in December was not a hearing and that the next step was "to determine the best educational placement for Laurice upon the results of her evaluation and a discussion with you and Mrs. Ezratty regarding available placements." The Department pointed out that the Ezratty's could ask for "a formal hearing if you do not agree with our recommendations for placement."

A month later, on May 9, 1978, plaintiffs brought this action, and subsequently filed an amended complaint basically seeking an order directing the defendants to make a determination as to Laurice's special education status, qualify her "for the Special Education program, payment for her Special Education, both in the future and retroactively", and reimburse her for transportation expenses. On May 12, 1978, Mr. Ezratty wrote to the Puerto Rico Secretary of Education, stating that his meetings with Department officials indicated that adequate special education for Laurice did not exist in Puerto Rico and claiming that the Department should reimburse him for his daughter's special education expenses. Secretary Chardon responded that since Mr. Ezratty had filed a court case, "no action will be taken." During the next month, seeking to resolve the controversy without further court proceedings, Mr. Ezratty wrote twice more to the Secretary, formally appealing the Department's decision and "requesting a hearing by a hearing examiner." The Secretary again responded that, because of the court case, "no action will be taken."

During the next two years, as this litigation slowly proceeded, the following occurred: On November 29, 1978, the trial court dismissed plaintiffs' claim against the Commonwealth of Puerto Rico and the Department on the ground that the Eleventh Amendment barred suit against the state for monetary damages without its consent.[3] Plaintiffs have not appealed this ruling. The court allowed plaintiffs to maintain their suit against Secretary Chardon because plaintiffs "[seek] a variety of remedies including declaratory and injunctive relief. There is no request for monetary damages."

In January 1979, the federal government temporarily cut off EHCA funding to the Commonwealth of Puerto Rico because of noncompliance.

In June 1979 the Department wrote to Mr. Ezratty offering Laurice a placement in various *primary* schools (grades 1–6), though Laurice was a *secondary* school student (in the twelfth grade at that time).

---

**3.** The district court also dismissed the parties named as federal defendants in this case.

Plaintiffs have not appealed this aspect of the court's opinion.

In March 1980, a trial was held, apparently to offer evidence about whether Puerto Rico was, or was not, able to provide Laurice with appropriate education.

In July 1980, after the trial, the district court dismissed the complaint without prejudice on the ground that plaintiffs should exhaust administrative remedies.[4]

## II.

 As the Supreme Court pointed out in *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938), the doctrine of exhaustion of remedies provides that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." (footnote omitted.) In *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1968), the Court noted the important interests that the exhaustion doctrine serves. It allows the agency to develop a factual record, to apply its expertise to a problem, to exercise its discretion, and to correct its own mistakes, all before a court will intervene. Insofar as specialized administrative understanding is important, the doctrine thereby promotes accurate results, not only at the agency level, but also by allowing more informed judicial review. By limiting judicial interruption of agency proceedings, the doctrine can encourage expeditious decision making. Insofar as Congress has provided that an agency will decide a matter in the first instance, to apply the doctrine normally furthers specific Congressional intent. And, as a general matter, the doctrine promotes a sensible division of tasks between the agency and the court: litigants are discouraged from weakening the position of the agency by flouting its processes, while court resources are reserved for dealing primarily with those matters which could not be resolved administratively. Thus, the doctrine serves interests of accuracy, efficiency, agency autonomy and judicial economy. *See generally*, 3 K. Davis, Administrative Law Treatise, § 20.01 *et seq.* (1958 & Supp. 1965 & Administrative Law of the Seventies); L. Jaffe, Judicial Control of Administrative Action 424–458 (1965); Fuchs, *Prerequisites to Judicial Review of Administrative Agency Action*, 51 Ind.L.J. 819, 859–69 (1976).

 There are instances, however, in which application of the exhaustion doctrine will not serve these interests. The issue may be a pure matter of law as to which specialized administrative understanding plays little role. Further agency proceedings may be futile, only delaying an ultimate resolution. Sometimes to require exhaustion will not only waste resources but also work severe harm upon a litigant. Thus, not surprisingly, the exhaustion doctrine "is not to be applied inflexibly," *McGee v. United States*, 402 U.S. 479, 483, 91 S.Ct. 1565, 1568, 29 L.Ed.2d 47 (1971); *United States v. Newmann*, 478 F.2d 829, 831 (8th Cir. 1973), and courts are free to use their discretion, *United States Ex Rel. Marrero v. Warden, Lewisburg, Pen.*, 483 F.2d 656, 659 (3rd Cir. 1973), *rev'd on other grounds*, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974), applying the doctrine, or not, in accordance with its purposes. *McKart v. United States*, 395 U.S. at 193, 89 S.Ct. at 1662. Indeed, the legislative history of the Act reflects the understanding that exhaustion is not a rigid requirement.[5]

---

**4.** The district court also dismissed on the grounds of "primary jurisdiction." We believe that the "exhaustion" doctrine rather than the "primary jurisdiction" doctrine more aptly governs the facts of this case. *See* 3 K. Davis, Administrative Law Treatise, § 20.01 (1958 & Supp. 1965 & Administrative Law of the Seventies). Regardless, given our holding, there is no need to consider the "primary jurisdiction" issue.

**5.** During the debate on the Conference Report on the *Education for All Handicapped Children*

Act, Senator Harrison Williams, author of the Senate bill and Chairperson of the Labor and Public Welfare Committee, stated:

> Mr. President, with regard to the complaints, I want to underscore that exhaustion of the administrative procedures established under this part should not be required for any individual complaint filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter.

121 Cong.Rec. 37416 (1975). A number of lower courts have held that exhaustion of adminis-

When the various interests served pull in the direction of exhaustion, it is required, but where they pull in different directions, analysis of the particular case at hand is necessary. *See* K. Davis, Administrative Law of the Seventies 446 (1976).

█ Analyzing this case in some detail in terms of those interests indicates that referral back to the agency is appropriate here. The underlying issue in this case—whether the Department offered Laurice the educational program to which she was entitled—is a matter that calls out for resolution initially at the agency level. Working out a specific and final IEP (which was not done) calls for expertise and discretion; and, an initial independent review of the IEP at an agency level would serve the major purposes of the exhaustion doctrine. Indeed, Congress specifically mandated such a review in 20 U.S.C. § 1415; and, a review of the cases shows that it has helped to clarify issues even when it has not resolved them. *See, e. g., Stemple v. Board of Ed. of Prince George's Cty*, 623 F.2d 893 (4th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); *Doe v. Anrig*, 500 F.Supp. 803 (D.Mass.1980); *Boxall v. Sequoia U. High Sch. Dist.*, 464 F.Supp. 1104 (N.D.Cal.1979).

But, the exhaustion issue here is not an easy one for the simple reason that in this instance it was the *agency* not the plaintiffs that prevented administrative remedies from being exhausted. The Secretary refused plaintiffs' request for further agency action and hearing on the ground that plaintiffs' suit was currently pending. The Secretary's ground in fact provides no justification for refusing plaintiffs the procedures to which the statute and regulations entitled them. Even had it done so, the

Secretary's letters make plain that he was unwilling to provide any further departmental proceedings to exhaust. The Secretary now suggests`in his brief on appeal that the agency is willing to proceed with Laurice's case. He states that "the case should be referred to the agency for the administrative consideration of plaintiffs, appellants' claims." Presumably, the trial court also believed that administrative remedies would now be made available. Thus, we must decide whether the existence of an administrative remedy at this stage of the proceedings should lead a court to refer the case back to the agency when it was the agency's fault that administrative remedies were not exhausted in the first place.

Normally, in such circumstances, we would refuse to return the case to the agency. To send the case back would seem unfair to the plaintiffs and might seem to condone the agency's violations of the law's procedural requirements. *Ecology Center of Louisiana v. Coleman*, 515 F.2d 860, 865 (5th Cir. 1975); *Diapulse Corp. v. FDA*, 500 F.2d 75, 78 (2d Cir. 1974); *Air Products & Chemicals, Inc. v. United Gas Pipe Line Co.*, 503 F.2d 1060, 1063 (Temp.Emer.Ct.App. 1974). Moreover, the trial court has already heard the evidence. Nonetheless, there are several special circumstances present here that lead us to conclude that the trial judge's disposition of this case was correct and to affirm his dismissal without prejudice.

First, it is unclear whether, at this point, plaintiffs present the courts with a justiciable legal claim. Laurice is now in college. Her requests for future relief—a declaration of future entitlement to special education and placement in a special education program—are moot. As Mr. Ezratty (con-

---

trative procedures under the Act is not required when exhaustion would be futile. *Sessions v. Livingston Parish School Bd.*, 501 F.Supp. 251, 254 (M.D.La.1980); *Monahan v. Neb.*, 491 F.Supp. 1074, 1086 (D.Neb.1980); *Doe v. Koger*, 480 F.Supp. 225, 228 (N.D.Ind.1979); *Armstrong v. Kline*, 476 F.Supp. 583, 601–602 (E.D. Pa.1979), *remanded on other grounds*, 629 F.2d 269 (3rd Cir. 1980); *Harris v. Campbell*, 472 F.Supp. 51, 53–54 (E.D.Va.1979); *Loughran v. Flanders*, 470 F.Supp. 110, 112 (D.Conn.1979);

*Campochiaro v. Califano*, No. H–78–64, slip op. at 4, (D.Conn. May 18, 1978); *New York State Association for Retarded Children, Inc. v. Carey*, 466 F.Supp. 479, 486 (E.D.N.Y.1978), *aff'd*, 612 F.2d 644 (2d Cir. 1979).

Exhaustion has been required where such a course of action would not have been futile. *Sessions v. Livingston Parish School Bd.*, 501 F.Supp. at 254–255; *Harris v. Campbell*, 472 F.Supp. at 55.

tinuing to serve as his daughter's attorney on appeal) conceded at oral argument, she is left with a claim for monetary relief—money to which she believes the Act entitled her for previous years.[6] Yet, when the district court dismissed plaintiffs' claim against Puerto Rico and the Department, the court also stated that it would allow plaintiffs to proceed against Secretary Chardon because their claim against him was *not* for monetary relief. The court's opinion might be taken either as dismissing any claim for monetary relief against Chardon or as holding that the complaint did not state a claim for monetary relief against him. Plaintiffs have not appealed from the former holding, nor asked to amend the complaint to overcome the latter holding. Plaintiffs' attorney seemed to recognize this problem at oral argument, for he said that he would have "to amend the complaint now because we're going to have to go back and ask for the funds."

■ Second, even if we take plaintiffs as setting forth an appropriate claim for monetary relief, in this unusual set of circumstances, plaintiffs may find it easier to obtain the relief they seek from the agency than from the court. We reach this conclusion from our preliminary examination of the question whether the Eleventh Amendment bars the courts from granting plaintiffs the monetary relief that they now seek. It is clear that the Eleventh Amend-

ment bars a suit against a state employee for money that will be paid from the state treasury unless the state consents to that suit.[7] *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Thus, assuming that the reimbursement apparently sought here would come from the state treasury, plaintiffs cannot recover unless they show that Puerto Rico has consented to suits for monetary relief under the Act.[8] Puerto Rico has not expressly consented to such suit. Can consent be implied here? On the one hand, the Act states that suits can be brought in federal court and the court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Two lower courts have found that this language implies a private action for monetary relief. *Monahan v. Neb.*, 491 F.Supp. 1074, 1094 (D.Neb.1980); *Boxall v. Sequoia U. High Sch. Dist.*, 464 F.Supp. at 1112. On the other hand, another lower court, citing *Edelman*, held that there was no cause of action under EHCA for monetary reimbursement from the state. *Stemple v. Board of Ed. of Prince George's Cty.*, 464 F.Supp. 258, 262 (D.Md.1979), *aff'd on other grounds*, 623 F.2d 893 (4th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). Moreover, several powerful considerations militate against finding any such implied consent. For one thing, the cited provision does not specifically refer to suits for monetary relief.[9]

---

6. Apparently, plaintiffs seek monetary relief for reimbursement for expenditures for Laurice's special education in Vermont, *see, e. g., Boxall v. Sequoia U. High Sch. Dist.*, 464 F.Supp. at 1107, 1112, and not for damages to Laurice, if any, resulting from defendant's alleged failure to implement an appropriate IEP. *See, e. g., Loughran v. Flanders*, 470 F.Supp. 110, 111, (D.Conn.1979).

7. The principles of the Eleventh Amendment, which protect a state from suit without its consent, are fully applicable to the Commonwealth of Puerto Rico. *Carreras Roena v. Camara de Comerciantes, Etc.*, 440 F.Supp. 217, 219 (D.P.R.1976), *aff'd mem.*, 559 F.2d 1201 (1st Cir. 1977); *Ursulich v. Puerto Rico National Guard*, 384 F.Supp. 736, 737 (D.P.R.1974).

8. We have no basis, on the record before us, to make a determination as to whether, in fact, the reimbursement apparently sought by plain-

tiffs would come from the state treasury or from federal funds, or from both. Two lower courts, dealing with other statutes, have held that the Eleventh Amendment and *Edelman v. Jordan, supra*, do not bar reimbursement where the payment comes from federal funds, not from the state treasury. *Harrington v. Blum*, 483 F.Supp. 1015, 1021 (S.D.N.Y.1979); *Witter v. Pennsylvania Nat. Guard*, 462 F.Supp. 299, 306 n.9 (E.D.Pa.1978). We need not reach this issue here.

9. For an example and discussion of a federal statute expressly authorizing a suit in federal district court against a state for reimbursement for lost wages and benefits, *see* 38 U.S.C. § 2022 of the Veterans' Reemployment Rights Act, and *Peel v. Florida Dept. of Transp.*, 600 F.2d 1070, 1079–82 (5th Cir. 1979) (holding suit under 38 U.S.C. § 2022 was not barred by the Eleventh Amendment).

And *Edelman* urges the courts to act cautiously in implying a *state's* consent from ambiguous provisions in a *federal* act. 415 U.S. at 673, 94 S.Ct. at 1360; *Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Assn.,* ——— U.S. ———, ———, 101 S.Ct. 1032, 1034, ·67 L.Ed.2d 132 (1981). For another thing, EHCA clearly foresees enforcement through the mechanism of the federal government negotiating with the state government, withholding federal funds if necessary to force state compliance. (Indeed, HEW withheld EHCA funds from Puerto Rico during a period for which plaintiffs would seek reimbursement.) It would be anomalous for EHCA to provide enforcement of its requirements upon the states *both* by the withholding of funds from the state *and* by allowing private individual suits against the state for monetary relief at a time when the state might have been deprived of the very funds that plaintiffs sought. The vast scope of the new program, the fact that it required states to begin, often for the first time, to direct individual attention to tens, or hundreds of thousands of new beneficiaries, the fact that the Act creates priorities for implementation, also argue against the conclusion that Congress intended the states to become immediately liable to court actions for monetary claims arising out of each individual failure to satisfy the program's every rule and regulation. *Cf. Loughran v. Flanders,* 470 F.Supp. 110, 114–15 (D.Conn. 1979). Finally, were we to hold that Congress did intend the Act to amount to "implied consent" to suit, we might have to reach the still more difficult question of the extent to which Congress has the power, under Article I of the Constitution, to abrogate a state's sovereign immunity. *See*

*generally Peel v. Florida Dept. of Transp.,* 600 F.2d 1070, 1079–82 (5th Cir. 1979); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System,* 229–30 (2d ed. Supp.1981); L. Tribe, *American Constitutional Law,* 139–143 (1978).

These considerations raise serious questions as to whether the Eleventh Amendment allows a court to award plaintiffs the relief they seek. But the Eleventh Amendment does not affect the power of the state education department which is bound to uphold the provisions of EHCA. The record of agency proceedings under EHCA elsewhere provides reason to believe that Laurice may be able to obtain appropriate monetary relief from the agency, if she is entitled to it under the Act.[10]

Third, our brief discussion of the Eleventh Amendment question illustrates that it is both difficult and important. It is, therefore, unwise to decide that question now without the benefit of briefs or argument and when plaintiffs have not specifically raised the issue in the appeal. Referral of this case to the agency may make decision of that question unnecessary.

Fourth, while the Department would seem primarily at fault for failure to follow the statutorily mandated procedures in this case, it cannot be said that it bears sole responsibility for the failure to resolve plaintiffs' claims at the agency level. Plaintiffs here have never sought judicial intervention to expedite determination at the agency level, though they were aware that they might have done so.[11] Indeed, instead of simply requesting a directive from the district court ordering the Department to act upon Laurice's claims, they sought, and proceeded with, a full scale trial on the merits.

---

**10.** *See, e. g., Doe v. Anrig, supra.*

**11.** On October 2, 1978, four months after the case was brought and almost two years before the trial, defendants placed in the record the full text of the Connecticut district court's opinion in *Campochiaro v. Califano,* No. H–78–64, slip op., (D.Conn. May 18, 1978), in which the court, in similar circumstances, ordered the state agency to convene an impartial hearing board, hear plaintiff's claim, and render a deci-

sion within forty-five days, as required by a regulation promulgated under the Act. 45 C.F.R. § 121a.512(a) (1979). Plaintiffs' attorney discussed *Campochiaro* in his Memorandum in Opposition to Defendant's Motion to Dismiss, and was undoubtedly aware of the possibility that he could quickly obtain a court order requiring appropriate action by the Department.

Thus, considerations related to agency expertise, accuracy and judicial economy suggest that exhaustion is still appropriate despite the agency's initial failure to provide an appropriate internal remedy. For these reasons, we affirm the district court's dismissal of this action without prejudice to allow plaintiffs to obtain an IEP and an impartial hearing to be provided by the Department. Needless to say, in these circumstances we construe the court's dismissal without prejudice to imply that the agency shall now act promptly and in good faith.

*Affirmed.*