**STRATEGIC ENERGY, LLC, Plaintiff**

v.

**WESTERN MASSACHUSETTS ELECTRIC CO.,
Defendant.**

**Civil Action No. 07–30052–MAP.**

United States District Court,
D. Massachusetts.

Jan. 4, 2008.

228

Duncan R. MacKay, Northeast Utilities Service Company, Legal Department, Hartford, CT, for Defendant.

Robert J. Munnelly, Jr., James F. Radke, Murtha Cullina LLP, Boston, MA, for Plaintiff.

*MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT* (Dkt No. 7)

PONSOR, District Judge.

## I. INTRODUCTION

Plaintiff Strategic Energy, LLC ("Strategic"), a retail electric supplier, has brought suit against Defendant Western Massachusetts Electric Co. ("WMECO"), a local electricity distribution company, based on an error in WMECO's calculation of the electricity consumption of Strategic's customers that led to Strategic being overcharged for that electricity on the wholesale market. In a complaint filed April 6, 2007, Plaintiff outlined its three state law claims against WMECO: breach of contract (Count I), negligence (Count II), and professional negligence (Count III). (Dkt. No. 1, Compl.) Strategic seeks monetary damages in the amount of the $843,378.34 extra that it erroneously paid for its wholesale electricity supply.

Defendant has responded with a motion to dismiss or for summary judgment with respect to the entire complaint, arguing a lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), or alternatively, failure to state a claim under Fed. R. Civ. P. 12(b)(6) or 56. (Dkt. No. 7.)

For the reasons stated below, the court will allow this motion as to Count III, but deny the motion as to Counts I and II.

## II. FACTS

As required for a motion to dismiss, the facts as contained in the complaint and related documents are set out in the light most favorable to Strategic.[1] *Rodriguez–Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 94 (1st Cir.2007).

### A. *The New England Electricity Market*

Both Strategic and WMECO are part of New England's regional electricity market.

---

1. It is not necessary to consider this motion as one for summary judgment, since neither party relies on documents outside the proper scope of consideration on a motion to dismiss. Under Rule 12(b)(1), the court may look to documents available as attachments to the complaint or the motion to dismiss itself. *See Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir.2002). The grounds for dismissal offered under Rule 12(b)(6) are confined to issues addressed fully in the pleadings. Even if the court were to consider this as a motion for summary judgment, the result would be the same, since except for Count III none of the claims can be resolved as a matter of law based on the undisputed facts. *See Feliciano*

As a retail electric supplier, Strategic buys electricity on the wholesale market and sells it to retail customers. WMECO, a monopoly, owns all of the distribution infrastructure within its service territory in western Massachusetts and transmits electricity to all of Strategic's retail customers within that area.

ISO New England, Inc. ("ISO–NE")[2] is a private, nonprofit entity that runs the region's power grid and its restructured wholesale energy market (known as the New England Power Pool, or "NEPOOL") pursuant to a Federal Energy Regulatory Commission ("FERC") tariff. ISO–NE's main purpose is to determine wholesale electricity prices and calculate the corresponding charges to the entities who buy energy on the wholesale market. For retail suppliers such as Strategic, ISO–NE determines those charges retrospectively, using data from the meters of the supplier's customers to calculate how much energy they used in total and thus how much power the supplier must pay for.

The Massachusetts Electric Utility Restructuring Act, St. 1997, ch. 164, § 312, requires WMECO and other transmission entities to gather the necessary meter data and use it to estimate retail customers' electricity usage, also known as the "load information," which is then transmitted to both ISO–NE and the supplier. Massachusetts' former Department of Telecommunications and Energy (now reorganized into several different agencies) has promulgated a set of terms and conditions to govern this relationship between retail suppliers and distributors. (Dkt. No. 1, Ex. B.) WMECO and Strategic subscribed

to those terms in a contract signed March 9, 2001.[3] (Dkt. No. 1, Exs. A, B.)

The load determination requires some estimation by the distributor to account for factors such as electricity lost in transmission over the power lines and thus not accounted for on customers' meters. (*See* Dkt. No. 14, Supplemental Aff. of Robert A. Baumann ¶¶ 7, 9.) Therefore, in order to facilitate billing, the distributor supplies an initial rough estimate of electricity consumption (the "37–hour estimate") to ISO–NE soon after it initially gathers the meter data. (*See id.* ¶ 6.) ISO–NE then issues a "Preliminary Settlement Statement" to the supplier that states the supplier's financial obligations based on the initial estimate submitted by the distribution company. The issuance of the Preliminary Settlement Statement commences a ninety-day "resettlement period" during which the supplier can review the distributor's estimates and notify the distributor and ISO–NE of any apparent errors in the settlement statement or the load information itself.

The distributor (in this case, Defendant WMECO) next transmits a "90–day estimate" to ISO–NE, an intermediate estimate based on the original meter data as well as any additional information that has become available, including any errors reported by the retailer. ISO–NE uses that second estimate to formulate a "Final Settlement Statement." Once the Final Settlement Statement is issued, ISO–NE also sends an invoice to the supplier (in this case, Plaintiff Strategic) detailing its payment obligations. If the retailer has already paid based on the Preliminary Settlement Statement, any discrepancies

*de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000).

**2.** ISO stands for "independent system operator."

**3.** Although the Terms and Conditions filed with the court are dated May 17, 2002, after the contract was signed, neither party disputes that they are the correct terms governing this dispute.

between it and the final invoice are addressed through a "true-up." ISO–NE administers this process pursuant to a section of the FERC tariff termed the "Billing Policy." (Dkt. No. 8, Ex. 3, § 6 [hereinafter Billing Policy].)

The Billing Policy allows a market participant to challenge its payment obligation through a "Requested Billing Adjustment" ("RBA") submitted within the ninety-day resettlement period. Section 6[4] of the Billing Policy outlines the procedure for resolving such disputes. A market participant challenging the amount due on a fully paid invoice "shall seek to recover such Disputed Amount ... by first submitting a request for billing adjustment to the ISO." (Billing Policy § 6.1.). Section 6.2 adds that

> [e]xcept as otherwise set forth in this Section 6.2, nothing in this Section 6 shall in any way abridge the right of any Covered Entity to seek legal or equitable relief under the Federal Power Act and/or any other applicable laws with respect to any Disputed Amount. Prior to commencing a proceeding before the Commission or other regulatory or judicial authority with jurisdiction to resolve the dispute which is the subject of the [RBA], the Disputing Party must first submit the [RBA] to the ISO for review.

Upon submission of an RBA, ISO–NE reviews the petition pursuant to the procedures in section 6.3 of the Billing Policy. Once ISO–NE issues a decision, the petitioning party has twenty days to appeal it by "commencing a proceeding before the Commission or other regulatory or judicial authority with jurisdiction over the dispute, or [filing] an appeal pursuant to [the arbitration provision] of this Policy."

(Billing Policy § 6.3.6.) If the party does not appeal, the ISO–NE decision becomes "final and binding." (*Id.*)

### B. *The 2004 Dispute*

In early 2004, Strategic received its Preliminary Settlement Statement for January 23 through January 31, 2004, inclusive. It reviewed the statement for errors and found it to be correct in all material respects. Based on the statement, Strategic paid its bill to ISO–NE in mid-February. Strategic then used the customer-specific data from WMECO to bill its retail customers.

Strategic went through a similar process for its February 1 through February 10 billing period, receiving the preliminary statement and reviewing it for material errors. Upon finding none, Plaintiff paid ISO–NE in mid-March and billed its retail customers accordingly.

WMECO later transmitted the 90–day intermediate estimates to ISO–NE and Strategic, with Strategic receiving the January and February load information on April 30, 2004 and May 24, 2004, respectively. (*See* Dkt. No. 14, Exs. 4, 6.) These estimates reflected certain errors—now alleged by Plaintiff but unknown to it at the time—substantially increasing the charges to Strategic above the amount based on the 37–hour estimates previously submitted. The resettlement window for the January time period was to close on May 10, 2004, while the window for February was to close on June 7, 2004, but in neither case did Strategic report any errors in the load information to ISO–NE before those deadlines. (*See* Dkt. No. 14, Supplemental Aff. of Robert A. Baumann ¶¶ 13–25.) In other words, Plaintiff did have some time

---

4. The copy of this policy submitted to the court is a marked-up version that includes changes in the section numbering made pursuant to a revision subsequently approved by FERC. As the parties refer to the sections according to the updated numbering system, so will the court.

in which to detect the errors and report them to ISO–NE before the resettlement period ended, but did not do so.

The Final Settlement Statements for January 23 to January 31 and February 1 to February 10, based on the 90–day estimates, became available on May 24, 2004, and June 22, 2004, respectively. When Strategic reviewed these statements, it found that the information they contained differed from the Preliminary Settlement Statements and the data in the 37–hour estimate it had received from WMECO.

Strategic promptly notified WMECO and ISO–NE of the problem. Upon investigation, WMECO advised Strategic that a meter-reading and data transmission error with regard to the consumption of one of the supplier's major commercial customers had resulted in WMECO reporting inflated data to ISO–NE in the 90–day estimates. ISO–NE had used this incorrect data to develop the Final Settlement Statements for these two periods.

WMECO did submit the corrected data to ISO–NE once Strategic so requested, but the new information was rejected by ISO–NE as untimely. Therefore, ISO–NE billed Strategic based on the erroneously inflated figures in the 90–day estimate, which was incorporated into the Final Settlement Statement. This inaccurate data resulted in a charge to Strategic of $843,378.34 more than what it had already paid based on the Preliminary Settlement Statement, which was calculated from the non-erroneous 37–hour load information estimate. Plaintiff had to pay that additional sum in the "true-up" period after the Final Settlement Statement was issued.

As the court understands the parties' explanation at oral argument, this overpayment resulted in an approximately $800,000 windfall to Strategic's fellow electricity retailers. WMECO's erroneous report that Strategic's customers utilized more electricity than they actually did apparently affected the calculations as to how much electricity was consumed by the customers of other suppliers on the same transmission network, resulting in underpayment by those other suppliers for the power they in fact used. The electricity generators participating in NEPOOL meanwhile received the same aggregate payment for the electricity transmitted over WMECO's network as they would have absent Defendant's error. Thus, while Strategic suffered a financial injury as a result of WMECO's errors, WMECO enjoyed no benefit.

Subsequently, Strategic made efforts to resolve its dispute as it was required to do by Part XVII of its agreement with WMECO. It filed an RBA with ISO–NE and sought a market resettlement from the NEPOOL Markets Committee, requesting a return of the windfall payment. However, both authorities refused to provide any relief to Strategic. ISO–NE stated that it could not make market corrections based on errors brought to its attention outside the ninety-day resettlement window, advising Strategic that:

> While Strategic correctly points [out] that under Section 3.6.1 of [Market Rule 1], the ISO may reconcile hourly asset meter readings after the 90 day period, these corrections ... are reconciled for corrected data the ISO receives within the 90 day period. However, the core issue of this dispute is beyond this point. Strategic's dispute is actually with the Assigned Meter Reader and/or Host Participant that submitted its metering data to the ISO for January and February 2004.... The ISO followed the Market Rule and manual direction and settled these months properly with data that was supplied by the Assigned Meter Reader and/or Host Participant.

Plaintiff then filed its complaint with this court on April 6, 2007, seeking relief under state law contract and tort theories.

Defendant now moves for the dismissal of Strategic's claims. WMECO first argues that the court lacks subject matter jurisdiction over all three counts under Fed. R. Civ. P. 12(b)(1) due to Strategic's failure to exhaust its administrative remedies. In the alternative, Defendant seeks to dismiss each of the three counts under Fed. R. Civ. P. 12(b)(6) or 56. WMECO contends as to Count I (breach of contract) that the contract expressly exempted Defendant from liability for errors such as the one it made here. As to Counts II, negligence, and III, professional negligence, Defendant argues that negligence-based claims are not permitted where they duplicate a breach of contract claim. Finally, WMECO asserts that Count III must be dismissed because the professional negligence doctrine does not cover negligence by electric utilities.

## III. DISCUSSION

### A. *The Rule 12(b)(1) Motion*

Rule 12(b)(1) allows for dismissal where, taking the facts in the light most favorable to the plaintiff, the court must conclude that it lacks jurisdiction over the subject matter of a case. *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir.1998). The burden lies on Strategic to demonstrate the existence of federal jurisdiction. *Id.*

WMECO's primary argument is that this court does not have jurisdiction over any of Strategic's claims because Plaintiff failed to complete the administrative process set out in the Billing Policy before

seeking a remedy in this forum. *See Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 2384, 165 L.Ed.2d 368 (U.S.2006) ("The [exhaustion] doctrine provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.") (citation and internal quotation marks omitted). It is undisputed that Strategic did not exhaust its administrative remedies, since it did not appeal ISO–NE's decision regarding its RBA within the twenty-day window mandated by the Billing Policy. However, that lapse does not spell doom for Strategic's suit.

▪▪▪ Exhaustion is a jurisdictional issue appropriate for consideration on a Rule 12(b)(1) motion, *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 7 & n. 6 (1st Cir.2005), but it is not an inescapable jurisdictional *requirement* unless exhaustion is mandated by statute. *Accion Social de P.R., Inc. v. Viera Perez*, 831 F.2d 365, 369 (1st Cir.1987). Neither the Federal Power Act, from which FERC derives the authority to create and regulate ISO–NE, nor the Billing Policy explicitly compels exhaustion of the RBA process before bringing suit in another forum. Though section 6.2 of the Billing Policy does require a party to file an RBA "[p]rior to commencing a proceeding before the [Federal Energy Regulatory] Commission or other regulatory or judicial authority with jurisdiction to resolve the dispute which is the subject of the" RBA, there is no express language particularly mandating *appeal* of an adverse decision by ISO–NE before a collateral proceeding is initiated.[5] Although the ISO–NE decision is now indisputably "final and binding" on Strategic

5. By contrast, the Federal Power Act requires that a party seek a rehearing from the Federal Energy Regulatory Commission on one of its decisions before bringing suit in another forum. 16 U.S.C. § 825*l* ("No proceeding to review any orders of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon.").

(Billing Policy § 6.3.6), that fact does not foreclose a remedy in this court if the remedy sought will not conflict with ISO–NE's decision not to resettle the market. (*See* Billing Policy § 6.2 ("[N]othing in Section 6 [the billing dispute procedures] shall in any way abridge the right of any Covered Entity to seek legal or equitable relief under the Federal Power Act and/or any other applicable laws with respect to any Disputed Amount.")).

Given the absence of any explicit jurisdictional bar, the issue of whether to allow an exception to the exhaustion requirement lies within the discretion of this court.[6] *See Portela–Gonzalez v. Sec'y of the Navy,* 109 F.3d 74, 77 (1st Cir.1997); *cf. Niagara Mohawk Power Co. v. N.Y. State Reliability Council,* 114 FERC P 61098, 61335 (2006) (exercising discretion of Commission to dismiss complaint brought under Federal Power Act where power company had not yet explored all possible administrative remedies before the New York ISO).

In deciding whether to dismiss this suit, the court must take into account the various purposes of the exhaustion doctrine. As the First Circuit summarized in *Ezratty v. Puerto Rico,*

[T]he [exhaustion] doctrine serves interests of accuracy, efficiency, agency autonomy and judicial economy. . . . There are instances, however, in which application of the exhaustion doctrine will not serve these interests. The issue may be a pure matter of law as to which specialized administrative understanding plays little role. Further agency proceedings may be futile, only delaying an ultimate resolution. Sometimes to require exhaustion will not only waste resources but also work severe harm upon a liti-

gant. Thus, not surprisingly, the exhaustion doctrine "is not to be applied inflexibly," . . . and courts are free to use their discretion . . . applying the doctrine, or not, in accordance with its purposes.

648 F.2d 770, 774 (1st Cir.1981) (citations omitted). "In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan,* 503 U.S. 140, 146, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

█ The First Circuit has highlighted certain factors to be considered when weighing the exhaustion requirement, including: whether the issue under review is a pure matter of law versus a factual matter where the agency's specialized expertise will be helpful in resolving the dispute, *Ezratty,* 648 F.2d at 774; whether "the agency is empowered to grant meaningful redress," *Portela–Gonzalez v. Sec'y of the Navy,* 109 F.3d 74, 77 (1st Cir.1997); whether "the pursuit of administrative remedies would be futile or inadequate," *Pihl v. Mass. Dep't of Educ.,* 9 F.3d 184, 190 (1st Cir.1993); and whether requiring exhaustion will prevent parties "from weakening the position of the agency by flouting its processes." *Ezratty,* 648 F.2d at 774. All of these considerations militate against applying the exhaustion requirement to a dispute such as this one, which is, in truth, wholly collateral to the regulatory regime overseen by ISO–NE.

█ The court most heavily weighs the fact that Strategic's complaint relates to its relationship with WMECO as collector of its load information, a relationship more

---

**6.** "The burden of demonstrating an exception from the exhaustion requirement falls on the party seeking to avoid the requirement."

*Rose v. Yeaw,* 214 F.3d 206, 211 (1st Cir. 2000).

closely regulated by Massachusetts state law than by FERC's or ISO–NE's regulatory provisions. Although ISO–NE allows for the correction of load information through its use of the 37–hour and 90–day estimates in coordination with Preliminary and Final Settlement Statements, it does not otherwise attempt to oversee the allocation of responsibility between electricity distributor and supplier. ISO–NE itself made its indifference to this distributor/supplier dispute clear in denying Strategic's RBA, stating that "the core issue of this dispute is beyond [the application of ISO–NE regulations.] Strategic's dispute is actually with the Assigned Meter Reader and/or Host Participant that submitted its metering data to the ISO for January and February 2004." (Dkt. No. 8, Ex. 5, at 1.)

While this statement did not absolutely prohibit Strategic from appealing the decision, the unavoidable implication was that Plaintiff could expect no relief from that quarter. *See Ezratty v. Puerto Rico,* 648 F.2d 770, 775 (1st Cir.1981) (stating that where agency has rejected jurisdiction, court will normally refuse to return it to the agency based on a failure to exhaust administrative remedies). Strategic thus presents a strong argument that pursuing further administrative appeals would have been futile. *See Gilbert v. Cambridge,* 932 F.2d 51, 61 (1st Cir.1991) (outlining availability of futility exception where "the prospect of refusal [is] ... certain (or nearly so)").

Continuation of the RBA process would have been useless for Strategic not only because it was certain to lose but also because it sought remedies outside of ISO–NE's purview. Most significantly, a contract suit allows Plaintiff to seek a remedy *against WMECO.* If Strategic had pursued and prevailed in its RBA action, ISO–NE's only remedy would have been to force Strategic's fellow suppliers to refund the windfall they received based on Strategic's overpayment. The real culprit, WMECO, would have suffered no penalty for what it now concedes was a major error in reporting the load information; the RBA process was not designed for the review of grievances relating to the contract between these two parties. *Cf. Massachusetts v. Lyng,* 893 F.2d 424, 428 (1st Cir.1990) (deeming district court correct in not requiring exhaustion where administrative hearing was "not designed to review" the legal questions at issue in the litigation at hand); *Puerto Rican Cement Co. v. U.S. Envt'l Prot. Agency,* 889 F.2d 292, 295 (1st Cir.1989) (waiving statutory exhaustion requirement where "the legal question at issue ... is plainly separable from, and therefore collateral to, all the matters that" would be considered in further pursuit of the administrative process). Strategic should not be denied its day in court based on the existence of an administrative process directed toward the relationship between power suppliers and generators rather than that between suppliers and transmitters.[7]

The last two factors, though less important in these circumstances, also tilt in favor of waiving exhaustion. This is not a situation where ISO–NE's "specialized expertise" is necessary; as the court has explained, ISO–NE's involvement in the load information relationship is tangential. If any governmental entity has a particular interest in this dispute, it is the Massachu-

---

**7.** Defendant raises the point that allowing remedy against it would leave third parties—the other suppliers—with the windfall overpayment. Though true, this fact merely highlights the awkward fit between the RBA process and Massachusetts' scheme for regulating electricity distributors' load estimation duties. It does not alter Plaintiff's legal right to seek a remedy under its contract with WMECO.

setts agency that established the terms of the parties' contract, as evidenced by Strategic's pursuit of state law claims. ISO–NE's regulations and its market expertise are not at the core of these claims.

Finally, it seems unlikely that allowing Strategic to proceed here "would induce 'frequent and deliberate flouting of administrative processes.'" *McGee v. United States,* 402 U.S. 479, 484, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971) (citation omitted). At oral argument, WMECO did raise the concern that forgoing the exhaustion requirement would allow market participants to sidestep the ISO–NE process and tinker with market prices retrospectively, thwarting the preference for speed over accuracy that is manifested in the limited window for resettlement. Though that potential danger hypothetically exists, it does not loom ominously here. Certainly few parties would prospectively choose the path of litigation to correct load information and pricing errors when the much more efficient RBA process is actually available to them.

Furthermore, because the ISO–NE's decision regarding market resettlement is "final and binding," the possibility of Strategic recovering the overpayment from its co-suppliers without ISO–NE sanction is foreclosed. WMECO's objection to being held responsible for the overpayment when it did not receive any benefit from its error may provoke sympathy, but it has no bearing on the exhaustion inquiry. In any case, forcing Strategic to appeal the RBA decision would not have resolved this gap between intersecting state and federal schemes. In sum, enforcing a requirement to exhaust would serve no purpose in this situation. The court will not penalize Plaintiff for having failed to contest ISO–NE's categoric denial of its request for relief.

### B. *The Rule 12(b)(6) Motion*

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, a district court "must take as true 'the well-pleaded facts as they appear in the complaint,'" and should not allow the motion "unless 'it appears beyond doubt the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Medina–Claudio v. Rodriguez–Mateo,* 292 F.3d 31, 34 (1st Cir.2002) (citations omitted).

#### 1. *Breach of Contract Claim.*

■ The agreement between Strategic and WMECO does contain a disclaimer of liability, which Defendant contends applies to this situation and bars Strategic's breach of contract claim (Count I). Specifically, section 9E of the Terms and Conditions provides:

> The process of Competitive Supplier load estimation involves statistical sample and estimating error. The Distribution Company shall not be responsible for any estimating errors and shall not be liable to the Competitive Supplier for any costs that are associated with such estimating errors.

(Dkt. No. 1, Ex. B, Terms and Conditions § 9E.) According to WMECO, the error it made qualifies as an "estimating error" for which section 9E protects it from liability.

However, the question of whether the inaccurate information was, in fact, the result of an "estimation error" presents a disputed issue of fact that the court cannot resolve on the pleadings alone. Strategic clearly contends in its complaint that this was a failure in WMECO's performance of "meter-reading and data transmission" (Compl. ¶ 44), not its estimation, and sufficiently supports that allegation with an e-mail from WMECO itself that refers to the problem merely as an "incorrect export" of a single customer's data with an unknown cause. (Dkt. No. 1, Ex. C.) Defendant

describes the intricacies of the estimation process, but at no point affirmatively explains how that process produced the mistaken data. Instead, WMECO merely chastises Strategic for not itself offering details regarding why this was not an estimation error. This critique places too heavy a demand on Plaintiff at the pleading stage and does not satisfy Defendant's burden of showing that no set of facts consistent with the complaint might support Strategic's claim.[8] *See Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988). This is the classic situation demanding further factual development, and thus Count I must survive.

### 2. *Economic Loss Doctrine.*

■ Defendant also argues that Strategic's tort-based claims (Counts II and III) should be dismissed in light of Massachusetts' economic loss doctrine, which provides that a party that breaches a contract is ordinarily not liable in tort where only pure economic loss is alleged. *Hooper v. Davis–Standard Corp.*, 482 F.Supp.2d 157, 159 (D.Mass.2007); *Arthur D. Little Int'l v. Dooyang Corp.*, 928 F.Supp. 1189, 1202–03 (D.Mass.1996). This principle rests on the idea that resolution of the parties' obligations under tort law is unnecessary and duplicative where they are able to negotiate those duties on their own through a contractual arrangement. *Id.* at 1202.

Strategic cites an established exception to this doctrine: a claim for negligent breach of contractual duties, as opposed to the simple failure to perform contractual duties. *Id.* at 1203. WMECO in turn points to two cases that indicate this exception may apply only in those situations where the breach is a violation of "an independent duty imposed by law" that regulates the relationship between the parties. *See Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.*, 396 Mass. 818, 822, 489 N.E.2d 172 (1986); *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F.Supp. 278, 289 (D.Mass.1987).[9]

The parties appear to fit into even this narrowed version of the "negligent breach" exception to the economic loss doctrine, as WMECO's contractual duties were essentially "imposed by law," not bargained for by Plaintiff. Although Strategic and WMECO technically entered into the contract independently, their freedom to negotiate its terms was circumscribed due to requirements imposed by Massachusetts law. *Cf. Clark v. Rowe*, 428 Mass. 339, 701 N.E.2d 624, 627 (1998) ("When the economic loss rule has been applied, the parties usually were in a position to bargain freely concerning the allocation of risk. . . ."). The details of the contract between Strategic and WMECO were substantially prescribed by a set of terms and conditions established by Massachusetts law to regulate the relationship between "every registered Competitive Supplier authorized to do business within the Commonwealth of Massachusetts, and . . . [ev-

---

8. Even if the court did convert this to a Rule 56 motion for summary judgment and considered the various affidavits and other materials submitted by the parties, the result would be the same. There is simply not sufficient factual detail available to resolve whether this was an estimation error within the meaning of the parties' contract.

9. The validity or strength of these cases is uncertain, given that they contain only brief discussion and have not been cited by any other courts on this point. Recent decisions continue to rely on *Abrams v. Factory Mutual Liability Insurance Co.*, 298 Mass. 141, 10 N.E.2d 82 (1937), the case that originated the broad exception for any negligent breach of contractual duties. *See, e.g., Islam v. Option One Mortg. Corp.*, 432 F.Supp.2d 181, 189 (D.Mass.2006). Fortunately, resolution of this precedential tangle is not necessary to reach a decision in this case.

ery] Distribution Company doing business with said Competitive Suppliers." (Dkt. No. 1, Ex. B, Terms and Conditions § 1A.) WMECO's responsibility for reading the meters of Strategy's customers was similarly mandated by Massachusetts statute. Massachusetts Electric Utility Restructuring Act, St. 1997, ch. 164, § 312.

Thus, allowing these negligence claims to survive does not subvert the underlying rationale of the economic loss rule, the idea that "parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover for damages caused by a breach of the contract." *Arthur D. Little Int'l v. Dooyang Corp.*, 928 F.Supp. 1189, 1202 (D.Mass.1996) (citation omitted). The parties did not have the opportunity to allocate risks and responsibilities according to their own preferences, since the terms of their agreement were mandated by law rather than negotiated, and therefore tort law may indeed provide protections to Strategic that it could not establish as a matter of contract.

The court does note that Plaintiff benefits here from the generous standard cautioning against hasty dismissal of well-pled complaints. WMECO's argument that the contract already provides a basis for remedy has some strength, and if the tort and contract claims prove duplicative, the court may revisit this issue on a motion for summary judgment.

### 3. *Professional Negligence.*

█ Strategic's claim for professional negligence lacks support from any Massachusetts cases involving a professional malpractice claim against electricity distributors or recognizing any special professional duty owed by such actors. The court, exercising diversity jurisdiction, declines to recognize such a dramatic expansion of this cause of action when it lacks a basis in extant state law. *Cf. Arthur D. Little Int'l v. Dooyang Corp.*, 928 F.Supp. 1189, 1202 (D.Mass.1996) (rejecting extension of professional negligence claim to business consultants); *Sorenson v. H & R Block, Inc.*, No. 99–10268, 2002 WL 31194868, at *10–*11, 2002 U.S. Dist. LEXIS 18689, at *31 (D.Mass. Aug. 27, 2002), *aff'd*, 107 Fed.Appx. 227 (1st Cir. 2004) (same as to tax return preparer). Therefore, Count III of Plaintiff's claim will be dismissed.

### IV.  CONCLUSION

For the foregoing reasons, the court hereby ALLOWS Defendant's Motion to Dismiss as to the professional negligence claim (Count III) and DENIES the motion as to the breach of contract and negligence claims (Counts I and II). The court will issue a separate order outlining the schedule for discovery and any further dispositive motions.

It is So Ordered.